294 So.2d 756

**J. T. McCAGHREN**

v.

**STATE.**

**8 Div. 347.**

Court of Criminal Appeals of Alabama.

Oct. 30, 1973.

Rehearing Denied Dec. 4, 1973.

510

David Cauthen and Ralph Slate, Decatur, for appellant.

William J. Baxley, Atty. Gen., L. G. Kendrick, and George W. Royer, Jr., Asst. Attys. Gen., for the State.

HARRIS, Judge.

From a conviction of murder in the first degree and a life sentence in the penitentiary, appellant prosecutes this appeal. At arraignment he interposed a plea of not guilty and was represented by counsel of his choice. He retained new counsel on his motion for a new trial and to represent him on appeal.

The actors in this tragedy, except the deceased, were members of the Mc-

Caghren family or interrelated or closely connected. It is a case of emotions run riot. Appellant was first married to Forie McCaghren. Two children, a boy and a girl, were born as a result of this union which lasted twenty-nine years. The boy (Tarvon) and the girl (Patsy) were grown and married at the time appellant shot and killed James D. Moore.

We glean from the record that appellant obtained a divorce from Forie on the ground of adultery and a high degree of bitterness ensued. The son took the side of his father. The daughter sided with her mother. Details of the property rights of the parties involved in the divorce proceedings are not in the record but it seems that appellant provided Forie a home in which to live. At this abode she entertained the deceased who was married but living separate and apart from his wife. Forie's conduct in entertaining the deceased in this home was such as to cause appellant to evict her and she moved in with her daughter. The eviction intensified the bitterness. Appellant claimed that the deceased called him and told him that he was going to get even with him for evicting Forie. Forie and the deceased continued their romance.

In the meantime appellant remarried. This last wife was named Selma, nicknamed "Tut". Selma and Forie had known each other since childhood and had gone to the same school. Appellant and the deceased were not strangers. They also grew up together and went to school together. By trade, appellant was a barber and deceased had been a patron, off and on, for years.

While appellant and Forie were still man and wife, he purchased eighty acres of land from Forie's father and mother. Title to the property was in the joint names of appellant and Forie with right of survivorship. There was a cash down payment and the balance of the purchase price was secured by a purchase money mortgage on the property. The old home was torn down and replaced with a trailer. According to appellant there was a verbal agreement that as long as he and the grantors got along they could occupy the trailer as long as they lived free of rent. It was in the area of this trailer that the killing occurred.

Appellant sold one acre of this land to his son, Tarvon, who constructed a brick home thereon. This home was erected a short distance from the trailer. Tarvon's home plays a role in the events leading up to the killing.

Appellant claimed that after he evicted Forie from his property, he was subjected to a course of harassment which included painting his barber shop with obscenities and throwing tacks in the driveway of his home causing the tires on his truck and his wife's car to become flat. At 4:00 A.M. on the day of the homicide, his dog waked him and he looked out the window and saw Forie's car leaving his driveway but he did not recognize anyone in the car.

With the above background, we now go to the day of the homicide and the events culminating in the fatal shooting.

On May 26, 1971, Selma called appellant and told him she had one or more flat tires. He told her where to carry the tires for repair. She also told him that when she got off work that afternoon she was going to try and find Forie and talk with her. She wanted to see if she could get things settled so that Forie would leave them alone. She left her work at 4:00 P. M. and drove to Tarvon's house. She found Forie's car parked a few feet from the back steps. Forie had gone to Tarvon's by prearrangement to pick up a play pen. Tarvon's wife had been keeping Forie's grandson while Tarvon's sister worked. Two days before the homicide, Tarvon called his sister and told her they were not going to keep the child again. Forie was requested to pick up the play pen and other baby things at this house. Finding no one at home, Forie went to the trailer nearby to visit her mother and father. While sit-

ting in the yard at the trailer, Forie observed Selma drive up to Tarvon's house, get out of her car and walk to the door. Selma returned to her car and drove it close to Forie's car and, according to some testimony, blocked it in. Selma sat on the backdoor steps to await the arrival of Forie. Forie's six-year-old granddaughter was visiting at the trailer.

This granddaughter walked over to her home and spoke to Selma and asked what she was doing there. Selma said she was waiting to see her mother. The child said her mother would not be home until 5:00 or 6:00 that afternoon, and Selma said, "That is all right. I will wait." The child then said, "They want to know what you are doing here." Selma said, "Who are they?", and the child replied, "Granny." Selma told the child, "You tell Granny that I want to talk to her, that we have some business to discuss and agreement to come to, and if she does not come up here and talk to me, I will come down there and talk to her." Forie did not go to the house to see Selma and Selma did not go to the trailer to talk to Forie. Selma then called her husband and told him where she was and that she was going to stay there and talk to Forie when she came up there to get her car.

Appellant closed his shop around 6:00 P.M. and drove to a field where he had three tractors plowing. These tractors were being operated by Tarvon, appellant's stepson Don Layton, and Ed Hanner, who appellant had hired. Tarvon told appellant that he understood Forie had been making inquiries as to where they could be located. He advised appellant to leave and go to Tarvon's house and keep an eye on the equipment in the barn. Ed Hanner's wife was riding the children around and came to the field. Appellant decided to ride with Mrs. Hanner to Tarvon's house. Just before arriving at Tarvon's house, appellant laid down in the backseat so as not to be seen. He saw Selma sitting on the steps of Tarvon's house as he entered. He says he just spoke and went to the den and

sat on the couch. While sitting there he saw the deceased drive by in his truck.

Meanwhile the deceased was looking for Forie. He drove to the home where she was living with her daughter and son-in-law Carter Van and Patsy Davis. He got there around 7:30 P.M. He was worried about Forie being so late getting home. He called Tarvon's house to see if she was over there. Tarvon's wife answered the telephone and told the deceased that Forie was not there and hung up on him. The deceased decided he would drive by Tarvon's home and see if her car was there. He got in his pickup truck and drove to Tarvon's house, a distance of four to five miles. He saw Forie's car and thought it was blocked in. He returned to the Davis home and gave them this information. Carter Van and Patsy decided to ride with the deceased to Tarvon's home with the idea that Patsy could get her mother's car without having any trouble. They drove to the area near the trailer and parked near a well. The deceased and Carter Van got out and stood with their backs to the front of the truck, leaning against the truck. Patsy started walking toward her brother's home. Before she reached the driveway, she saw Don Layton, appellant's stepson, drive up in his car and park near the mailbox in front of the trailer. Don engaged Forie in a conversation.

Don told Forie that his mother Selma wanted to talk to her and that if she didn't go and talk to her there was going to be trouble. Forie told Don she was not going to Tarvon's house to talk to Selma and she didn't want any trouble; that she was standing on her parents' property and she didn't want any trouble down there either. Don then suggested that Forie go to appellant's home and talk to Selma. Forie refused, saying she didn't want any trouble. Tarvon walked up and started cursing his mother and accused her of putting tacks in his father's driveway and Forie denied the charge. Tarvon kept cursing his mother and pointed to the deceased and Carter Van and said, "You and those two

SOBs hadn't done anything but lie." The deceased stepped away from the truck and said, "Wait a minute, son." Tarvon pulled his pistol and pointed it at the deceased and told him to get his hands out of his pockets. He told the deceased two or three more times to get his hands out of his pockets or he would blow his head off, saying, "I know you carry a gun. I have seen it."

While Tarvon still had his cocked pistol on the deceased, Selma and appellant joined the group. What transpired thereafter is in hopeless conflict. Some witnesses testified that Selma jumped on Forie and they wrestled to the ground and were striking, scratching and pulling each other's hair when the shot that killed the deceased was fired. There is no dispute that the fatal shot was fired by appellant. Just before the shooting Tarvon switched the pistol from his right hand to his left hand and had the deceased by the shoulder when appellant fired one time. Later that night, Tarvon told one of the investigating officers in a signed statement, "I don't know why daddy shot Moore."

Appellant testified in his defense. He testified that shortly after he evicted Forie from the house he provided for her, he received a telephone call from the deceased in which the deceased told him that he was going to get even with him.

"Q. Now, what else did he say?

"A. He asked me if it—the first words he asked me after he identified himself, if I was happy with what I had. I told him I was. He said he hoped I was because I sure didn't get nothing in that swap, and he went ahead and asked me then if I felt that I had treated them fair with making them move out of the house. And he said I will get you later."

Appellant further testified that he heard someone say, "they have jumped on Don", and he left Tarvon's house with his pistol and ran to the place where the group was gathering. When he first observed the deceased, he had his back to appellant and was leaning backwards against the truck. He saw Don out in the road. He saw Tarvon standing west of the deceased. He saw the deceased moving toward Tarvon with his hands in his pockets. He heard Tarvon tell him to stop and take his hands out of his pockets and saw Tarvon pull his pistol on him. He saw the deceased stop and take his hands out of his pockets.

"Q. How many times did he say it?

"A. I heard it twice.

"Q. What did you hear exactly?

"A. He said, 'I said get your hands out of your pockets. I know you have a gun. I have seen it. And I will blow you in two.' And he taken his hands out of his pockets."

Appellant admitted that he shot the deceased while Tarvon still had his pistol pointed toward the deceased and had his hand on his shoulder. He was within a foot and a half of the deceased when he shot him and the deceased had more of his side to appellant than his back. Admittedly, the deceased was unarmed.

After the deceased fell on the ground, appellant stepped over his body and moved to where Selma and Forie were on the ground fighting. Appellant said to Selma, "Tut, what are you doing laying there?" Selma said, "I can't get up the way she is holding me." Appellant said, "Well, get up from there and get it over with."

Appellant left the scene of the homicide and surrendered himself at the sheriff's office.

Appellant objected to being put to trial because neither he nor his counsel was served with a copy of the indictment charging him with murder in the first degree. He further objected to going to trial because a copy of the venire drawn to try the case had not been served upon him or his counsel before trial. The trial court overruled both objections and announced that he was going to be sure that appellant

got forty-eight (48) jurors under the statute. The statute the court was referring to is codified in Title 13, Section 125(30c), Code of Alabama 1940, Pocket Parts, Act No. 136, 1971, 1st Ex.Sess., approved May 11, 1971. This statute reads as follows:

"No special venire shall be ordered or drawn for the trial or trials of a defendant or defendants in capital felonies in the circuit court of the eighth judicial circuit of Alabama, but a defendant or defendants in capital felony cases shall be entitled to strike from a list of not less than forty-eight (48) competent jurors obtained from the regular juries in court for the week. At least one hundred (100) names shall be drawn from the jury box for service during any week in which a capital case is set for trial."

Appellant was put to trial on November 15, 1971, more than six months after Act No. 136, supra, was passed by the Legislature and approved by the Governor.

Appellant strenuously insists that Act No. 136 is a local law and violates Section 106 of the Constitution of Alabama 1901 in that no notice was given and proof made as required for local legislation.

In the light of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, we do not deem it necessary to deal with the constitutionality of this Act. Since *Furman,* decided June 29, 1972, all of the statutes of Alabama providing death penalties are now to be considered noncapital felonies. Title 30, Section 63, Code of Alabama 1940, provides that a special venire be drawn only in capital cases. Under *Furman* this statute, for all practical purposes, is relegated to a state of limbo. It has no field of operation in the criminal procedure of this state at this time and will not have until, and unless, the Legislature enacts new laws carrying the death penalty. Should the Legislature provide the death penalty for the commission of specified crimes, then this section providing for special veniries may be reactivated.

At arraignment the judgment entry shows the following:

"October 22, 1971: This day in open court comes the State of Alabama by its District Attorney and the defendant in his own proper person and by Attorneys (naming them) and the defendant being arraigned upon the indictment in this cause charging him with the offense of Murder in the First Degree (the same having been read and explained to him) pleads not guilty. Thereupon said cause is set for trial on November 15, 1971.

"November 15, 1971: This being the day that this cause has been regularly continued and set for trial comes the State of Alabama by its District Attorney and the defendant in his own proper person and by attorneys (naming them) and the defendant being arraigned before a jury upon the indictment in this cause charging him with the offense of Murder in the First Degree (the same having been read and explained to him) pleads not guilty.

"Issue being now joined and defendant being furnished with a striking list of 49 competent jurors obtained from a list of 100 regular jurors drawn for service during this session of court as required by law and * * *."

The above quoted portions of the judgment entry, which speaks verity, shows that appellant was arraigned twice over a three-week period. On each occasion the indictment was read and explained to him in the presence of his attorneys. The foregoing does not show that a formal demand for a copy of the indictment was made by appellant and that his demand was denied.

A case strikingly similar is Howard v. State, 146 Ala. 149, 41 So. 301, where our Supreme Court said:

"By Section 6 of the Bill of Rights in the Constitution of 1901 it is provided that the accused in a criminal prosecution shall have the right 'to demand the

nature and cause of the accusation and to have a copy thereof'. This right, however, is one that may be waived by the accused. On the facts stated this court committed no error in its rulings. The defendant had been informed of the accusation against him on his arraignment, and pleaded not guilty. He then delayed until his case was called for trial, more than 10 days after his arraignment, before demanding a copy of the indictment. By this conduct he waived his right to a copy, and under the circumstances the court was under no duty to require that a copy of the indictment be furnished him."

■ The record in the instant case shows that appellant was arraigned twice with the indictment being read and explained to him each time. Twenty days, excluding Sundays, elapsed from the date of the first arraignment to the second one which was on the day of trial. The failure to demand a copy of the indictment during this period amounted to an effective waiver of his right to a copy. See Morse v. State, 22 Ala.App. 93, 112 So. 806; Robinson v. State, 44 Ala.App. 206, 205 So.2d 524.

Appellant asserts that the trial court committed reversible error in refusing to allow the appellant to show threats made by the deceased against him which had been communicated to him.

■■ After evidence has been adduced in a homicide case tending to show that the defendant acted in self-defense, evidence as to the violent and dangerous character of the deceased and evidence as to previous threats against the defendant is admissible. But,

"in the absence of a tendency of the evidence to show that the defendant was without fault in bringing on the fatal encounter, that he was in imminent peril, or that he could not avoid the difficulty or retreat without increasing his peril, the defendant cannot prove the bad character of the deceased for turbulence, nor threats by him toward the defendant, nor of a prior difficulty with him, though of a serious nature." Farley v. State, 279 Ala. 98, 182 So.2d 364; Sanders v. State, 242 Ala. 532, 7 So.2d 483.

Appellant was allowed to testify that after he evicted his former wife, he received a telephone call from the deceased and during the conversation the deceased threatened him. From the record:

"Q. Did Mr. Moore threaten you in this conversation?

"A. He did.

"Q. Now, what was his exact words in this threat?

"MR. NELSON: We object.

"THE·COURT: Too late now. Overruled.

"A. He said he would get me later.

\* \* \* \* \* \*

"Q. Did, J. T., prior to May 26th, 1971—had Mrs. Moore, J. D.'s wife called you and told you that J. D. had threatened you?

"MR. NELSON: We object, leading.

"THE COURT: Well, I will let him lead some, because I think he will have to. If he can show a communicated threat through Mrs. Moore, I will let you do that. I think you are going to have to ask the exact words almost, or words in substance.

"Q. Judge says you can answer.

"THE COURT: Go ahead.

"A. She did.

"Q. What were her exact words?

"MR. NELSON: We object.

"THE COURT: I will overrule that if he is able to tell us.

"A. Do you want the story or the conversation.

"Q. Yes, sir.

"THE COURT: No, sir.

"Q. Just the exact words.

"THE COURT: Just tell what she said on that occasion.

"A. She said that he had threatened me, and she didn't know what he would do, but I should watch him."

■ Appellant was asked on direct examination if he knew the deceased's reputation in the community in which he lived for carrying a gun prior to May 26, 1971, and appellant replied, "Only hearsay and seeing the imprint of it in his pocket"; that he had seen the imprint of it in his pocket on several occasions when he came to the barber shop to get his hair cut; that he had never actually seen the gun but only the imprint of it in his pocket. He was then asked if the deceased had a general reputation in the community for carrying a hand gun and stated that he had heard people say that he carried a gun. The state objected and moved to exclude the answer. The court said: "Don't consider that answer, gentlemen. It is not responsive. It is not responsive to the question. The question was did he have such a reputation. The only answer the witness can make is yes or no." Whereupon the witness answered, "yes." No further ruling of the court was invoked, therefore, this was proof that the deceased had a reputation in the community for carrying a gun.

A deputy sheriff of Morgan County testified in behalf of appellant. He said he lived in the same community as the deceased; that he knew the general reputation of the deceased in the community and that he had a reputation for carrying a gun. It developed on cross-examination that this witness was related to Selma.

While at Tarvon's home, appellant claimed that he heard a female voice say, "They have jumped on Don." Don carried a pistol in his car when he drove to the scene of the homicide. Tarvon left home with a concealed pistol on his person. Appellant left after Tarvon and carried a concealed pistol. Ed Hanner passed appellant on the way to the death scene and carried a concealed pistol. The distance from Tarvon's house to the well where the shooting occurred was approximately four hundred (400) feet. The logical deduction is that they felt that trouble was brewing and they prepared themselves to meet any eventuality. After it was all over, everyone walked away except James D. Moore, an unarmed dead man.

Van B. Pruitt, Assistant State Toxicologist, performed a postmortem examination on Moore's body and found, externally, an entrance wound in the left back chest from back of the armpit five inches downward. He opened the chest and the abdomen and "found that the hole, which I observed in the left chest, penetrated the left chest wall, and from that point now I was able to trace the path by its evidence of tissue destruction and hemorrhage through the left lung and a vein which empties into the lower portion of the heart, and it is called the vena cava, and then through the right chest wall on the lateral or side at the level of the third rib where I recovered a small jacketed slug embedded in the musculature."

Van B. Pruitt expressed an opinion that death resulted from this gunshot wound.

Appellant's pistol, a Titan model caliber twenty-five (25) automatic, was introduced in evidence. Van Pruitt test fired this pistol and made a microscopic comparison of the test bullet with the slug he removed from the body of the deceased and concluded, "It is my opinion that the slug which I recovered from the body of James Moore was fired from this Titan 25 caliber automatic loading pistol to the exclusion of any other similar weapons."

State's Exhibit 1, a photograph showing the body of the deceased at the place where he was shot, was sent to this court along with other requested Exhibits, pursu-

ant to Supreme Court Rule 51. Exhibit 1 clearly shows that Moore came to his death as the result of a bullet which entered his left back.

Appellant had the full benefit of his plea of self-defense. In the oral charge to the jury, the Court said:

"However, it is not necessary that the defendant should have been in actual danger of death or great bodily harm at the time he killed the deceased, or that retreat would have really increased his peril in order for him to be justified. He had the right to act on the appearance of things at the time, taken in the light of all the evidence, and he had the right to interpret the conduct of the deceased in the light of any threat that the evidence may have shown the deceased to have made against the defendant. If the circumstances attending the killing were such as to justify a reasonable man in the belief that he was in imminent danger of great bodily harm or death, and that he could not have retreated without adding to his peril, and the defendant honestly believed such to be the case, then he had the right to act in his own defense, although, as a matter of fact, he was not in actual danger, and retreat would not have endangered his present safety; and if the jury believe from the evidence that the defendant acted under such conditions and circumstances as set forth above, the burden of showing that he was not free from fault in provoking or bringing on the difficulty is on the State, and if not shown the jury should acquit. For, when the defendant has established a present, pressing necessity on his part to take life, which involves disproof of an opportunity to safely retreat, the burden is on the prosecution to show that the defendant was at fault in provoking or bringing on the difficulty.

"All those elements I have outlined to you must come together at one time before the defendant could successfully in-

voke the doctrine of self defense. In like kind, the law says that under certain circumstances you can come to the defense of another person, and it is one of the theories of the defendant's case, as presented, that he acted in defense of his wife or his son. The law says that, and I won't go into all the different people that you could act in—that the doctrine of self defense would apply for you to come to the rescue of, but I will tell you that a man's wife and his son do fall in the category and that he can invoke the doctrine of self defense for the purpose of saying that he was going to defend. another. A person who goes to the defense of another does so at his peril, because he then stands in the shoes of the person to whose aid he goes, and if he goes to the aid of one who provoked the difficulty or who could have retreated or who was not free from fault in bringing on the difficulty or who is not in imminent peril then the doctrine doesn't help him any better than it would have helped the person he came to the aid of. In other words, he stands in their same shoes. If the defendant came to the assistance of his wife, or he came to the assistance of his son, you would look at these elements of self defense as I have given them and supposing that—that the son or wife were the defendant—they had inflicted the fatal blow, then to justify the homicide either of them would have had to have been shown self defense or the evidence would have had to have shown it for them just as I have outlined it for the defendant.

"The law is well settled in this state that the right of one to defend himself, and the one who defends the other is upon no higher plane than the one defended, and so if the one defended is not free from fault in bringing on the difficulty, his defender cannot be. When one intervenes to defend another, even though the one be in imminent danger of life or limb, he does so at his peril, if he strikes in defense of one not free from fault in

bringing on the difficulty. When a father, in the necessary defense of his son or his wife, kills another, his right to justify on the grounds of self defense must have the same foundation as the act of the wife or son would have been, if he or she had committed the homicide; and the wife, as well as the son, must be in a position to invoke the doctrine of self defense on behalf of herself or himself.

"Now, that is the law as it applies to self defense either, for ones self, or as it applies to going to the aid of another— going to the aid of a son or wife."

Appellant contends the trial court committed a reversible error in excusing juror Frank Dobbs. The Court said:

"All right. Mr. Frank Dobbs, a member of this jury venire, came up after the qualifying and satisfied me, and I have made a record of it in the transcript, that he is unable to sit on this case at hand for religious reasons, and the court was satisfied that it was a legitimate excuse, and I am going to at this time excuse him unless there is an objection. Mr. Dobbs, you can be excused."

There was no objection or exception to this action of the court. Besides, Title 30, Section 5, Code of Alabama 1940, provides, "The court may excuse from service any person summoned as a juror if he is disqualified or exempt, or for any other reasonable or proper cause, to be determined by the court."

It is not necessary that the record show the nature of the excuse. If it appears that the court held the excuse good that is sufficient to raise a presumption of a "reasonable cause". Plant v. State, 140 Ala. 52, 37 So. 159.

Appellant contends that he was entitled to be tried in an atmosphere of impartiality, and when the cumulative effects of rulings by the court, though unintentional, which give the impression that the defendant or his counsel is acting improperly, he is entitled to a new trial. All of the cases relied on by appellant in asserting this principle of law deal with the conduct and statements of prosecuting attorneys.

The trial lasted several days and the proceedings cover three volumes on transcript paper. We have read and reread every page in these volumes. We do not agree with counsel that appellant was tried in an atmosphere of partiality. The trial judge maintained proper decorum throughout the long trial. The zeal and skillful trial tactics of counsel, both for the state and the defense, required the court to make many rulings, but, in so doing, he demonstrated stern impartiality.

Appellant also contends that juror Ragsdale had a fixed opinion as to the guilt of appellant and he declined to make this known to the court and the parties during the qualification questions posed to the venire. Testimony on this issue was taken on the motion for a new trial. In overruling the motion the court said:

"The Court has reviewed the affidavits, and considered the testimony offered ore tenus, including the testimony of the juror Ragsdale, and of the witness Curtis Parker. The Court found both of these witnesses to be creditable, straight-forward and honest witnesses, and if there is any conflict in the testimony of these two witnesses it is of a bening (sic) origin and reflects no culpability on either.

"The Court concludes, nevertheless, that the juror, Claude Ragsdale, did not entertain a fixed opinion against the defendant, J. T. McCaghren and that he answered the questions on voir dior (sic) with candor, and with no desire to conceal or reserve and (sic) fixed opinion on the matters in issue."

The granting or refusing of a motion for a new trial is a matter resting largely in the discretion of the trial court, and its order will not be disturbed on appeal unless some legal right of the appel-

lant has been abused. No reversible error is shown in the action of the trial court in denying the motion for a new trial.

There are other matters urged upon us for a reversal of this case. To treat each of them would unduly extend this overly long opinion. Suffice it to say that we have carefully considered all matters pressed upon us and we have found no error affecting the substantial rights of appellant.

Affirmed.

All the Judges concur.