Appellant-defendant was indicted for murder in the first degree and convicted of murder in the second degree. The jury fixed her punishment at ten years imprisonment, and she was sentenced accordingly.
The victim of the tragedy involved was Bobby Langley, defendant's husband of approximately three years, with whom she had been living for that period of time before he was killed about 11:00 P.M. on July 9, 1978. They were living in a mobile home in Cedar Bluff, living with them were Ricky Langley, the victim's fifteen-year-old son, and James H. (Grady) Sanford, an uncle of defendant.
The record abounds with evidence of turbulent relations between defendant and her husband. There was little, if any evidence, of a kind and considerate attitude of either toward the other. They had had an argument the day before his death. He told her that he was going to his half-sister's. He did not return until the afternoon of his death. He stayed around the trailer a while; he and defendant were fussing, and Mr. Langley cursed her. During the time Mr. Langley was away from the trailer that afternoon, defendant had taken some of his clothes and thrown them out on the steps and had shot holes through them with a pistol. At that time she also shot "the lights out of an old wrecked car that was sitting there." Mr. Langley picked up the pistol and put it in his pocket and thereafter left the trailer with Ricky. The two returned to the trailer about 11:00 or 11:30 P.M.
During the time defendant and Ricky were away from the trailer on the night of Mr. Langley's death, defendant went to her father's house, obtained a shotgun there, brought it to the trailer and "set it up between the coffee table and the couch." She then went to bed. The only eyewitnesses to the killing were Ricky Langley, Grady Sanford and the defendant. Each of them and the victim had consumed considerable beer during several preceding hours.
According to Ricky Langley, he and the victim returned to the trailer about 11:30 P.M. A material part of his testimony is as follows:
"Q What did you do after you all sat down?
 "A When we first came in, he told me to set the beer down. So, I set it down on the side of the chair as you go in the door. He got on the first couch there, and I got on the second one, or the far one. Mildred came through the house. There was a shotgun setting between the couch as you walk into the door with the end table.
"Q A shotgun?
"A Yes, sir.
 "Q Had it been there earlier in the day when you were there?
"A No, sir.
". . . .
 "A Yes, sir, she came through the trailer. She asked him if he thought he was too damn good to offer her a beer.
 "Q Now, let me ask you: At this point, where was she and where was your father when she said that?
 "A I don't know where she was at. She was in the back end of the trailer somewhere.
"Q She wasn't in that room at that time?
"A No, sir.
". . . . *Page 1269 
"Q What happened after she said that?
 "A He told her, `There it is. Get it if you want it.' She reached down and got her one.
"Q She got a beer?
"A Yes, sir.
"Q Was it open?
 "A No, she opened it herself. She took a drink out of it and set it on the stereo. She sort of trotted over there and grabbed the shotgun up and —
". . . .
 "Q All right. Go ahead. What did she do with the shotgun then?
 "A She grabbed it up in her hand and asked him how to shoot the thing.
 "Q Were those her exact words, Ricky, as well as you can remember?
 "A She said, `How do you shoot this damn gun?' Those were her exact words.
"Q Who did she ask that to?
"A My daddy.
"Q What did he say, if anything?
 "A He said, `When I shoot one, I pull the damn hammer back and pull the trigger.' That's all he said.
"Q Did she say anything else?
"A No. She just shot him.
"Q Did that happen immediately?
"A After she pulled the hammer back.
". . . .
"Q Where did the blast hit him?
"A Right here. (Indicating)
"Q You are indicating the middle of the stomach?
"A Yes, sir.
". . . .
 "Q All right. Did he have a gun or weapon in his hand at that time?
"A No, sir.
"Q Had he threatened Mildred?
"A No, sir.
"Q At that point?
"A No, sir.
"Q At any time?
"A No, sir. To the best of my knowledge, he didn't.
"Q I'm talking about when you were there?
"A He didn't threaten her."
As to what occurred after the victim and his son had returned to the trailer just before the shooting, James H. (Grady) Sanford testified:
 "Q Now, when Ricky and Bobby got back, about what time of the night was that?
"A It was way along in the night. I'll say 11:00.
". . . .
 "Q What did they do? Just tell us what happened when Ricky and Bobby came in at that time?
 "A Well, he just come in. And he had one beer open. And he handed me a beer. He said, `James, here's a beer. Drink it. I've got another six-pack in the car.'
"Q Where was Mildred at this time?
"A She was laying on the couch.
"Q On the couch there in the living room?
"A Yes, sir.
"Q Now, this was 11:00 or 12:00 at night.
"Q Tell us what happened next.
"A When she got up off the couch?
"Q Yes.
 "A She went in the kitchen. I don't know whether she went and got her a drink of water or what. I never paid no attention. Then she come back in the living room.
 "Q Let me ask you this, Mr. Sanford: Was the pistol still laying there on the coffee table at this time, at 11:00?
"A No, Bobby had it in his pocket.
 "Q When did he get that pistol and put it in his pocket?
 "A That was before he left and come back the last time.
"Q That's when he and Ricky left?
"A Yes.
"Q He'd gotten the pistol and put it in his pocket?
 "A Yeah. He said, `I'm going to get rid of this thing.'
"Q Going to get rid of it. *Page 1270 
 "A Going to sell it. He said, `You won't ever see this gun no more.'
". . . .
 "Q All right. Now, go back to when they came in, and what was said and done by Mildred and by Bobby about 11:00 or 12:00 this Sunday night.
"A Well, they were just swapping words.
". . . .
"Q But they were cussing. Were both of them cussing?
"A No. She wasn't.
"Q Was Bobby cursing?
 "A Yes. He said he was going down there to his half-sister's and live with her.
"Q Where was Bobby sitting at this time?
"A About a third a way of the couch.
". . . .
"Q What happened then?
"A She come back in the room.
"Q What did she say?
"A She didn't.
"Q Did anybody say anything?
"A Nothing was said.
"Q All right. What happened?
"A Well, I started to tell you a while ago.
"Q Could you tell us now please, sir?
 "A Yes, I can tell you. All right. She reached across my lap and pulled a shotgun from at the end of this couch leaned up against the wall. So, she steps back out in the floor. I'll say a foot and a half or two from where I was, and she looked at Bobby and asked him, `How do you shoot this thing?' He says, `You damned idiot, you pull the hammer back and pull the trigger.'
"Q What happened then?
"A The gun went off.
"Q The gun went off?
"A That was all that was said.
"Q Did she pull the hammer back?
"A She pulled it back.
"Q And she pulled the trigger?
"A She pulled the trigger.
"Q What happened to Bobby?
 "A Just like anybody that's shot, he went away from here.
". . . .
 "Q Let me ask you this: Was Bobby beating her up on this occasion?
 "A No. I told you one time that there wasn't no licks passed.
"Q Did he ever get up off the couch?
"A He never did.
 "Q Did he make any motion toward like he was going to beat her in any way?
"A No.
 "Q Did he have any kind of weapon out drawn on her or threatening her with it?
"A Not that I seen, and I was sitting right there."
The defendant's testimony as to what occurred the last time she saw her husband alive, as follows:
"Q What did you do after you put the shotgun up?
 "A I went in the first bedroom and laid down and went to sleep.
 "Q Did you have an occasion to get up again that night?
"A No. I was there when Bobby and them came in.
"Q Did you get up when Bobby and Ricky came in?
"A Yes.
"Q What, if anything, did you do when you got up?
"A Bobby was cussing, and that's what woke me.
 "Q In your best judgment, what did he say that woke you up?
 "A He was just loud mouthed drunk cussing. I don't recall what he was saying.
"Q Did you go into the living room?
"A Yes.
 "Q What, if anything, happened when you went into the living room?
 "A When I walked in the living room, he said, `What did you shoot my car up for?' I told him it wasn't his car; it was mine. He said, `G__ damn you.' I said, `What did you shoot my mother f___ing car up for.' I said, `Bobby, it's my car, it's not yours.' I don't know what all he *Page 1271 
said during that time, but I was scared to death.
"Q Was he drunk?
"A Oh, Lord, he was crazy drunk.
". . . .
 "Q Now, what else did Bobby say to you as you were walking through the living room?
 "A He said, `You G__ damned mother f___r, you're leaving tonight. You leave tonight if your G__ damned feet have to go first.' I said, `No, Bobby, I'm not __
 "Q Now, did he make any gestures at you as he did that?
 "A He was pointing like that. (Indicating.) His hair was sticking straight up, and he was slobbering drunk. I was scared to death.
"Q What happened then?
"A He just continued to cuss me.
"Q Where were you at that time?
"A I had got about to the bar.
"Q What, if anything, did you do then?
 "A Well, after I got to the bar when he was doing all of his cussing, the next think that I could remember is I saw Bobby bleeding, and I was standing there holding the gun.
"Q Was he still seated on the couch?
"A Yes.
"Q Mildred, what did you do with the gun?
"A I don't remember having the gun."
Major contentions of appellant are that the evidence was sufficient to permit a finding by the jury that defendant at the time she killed her husband was acting in self-defense, and for that reason the trial court erred in sustaining objections of the State to questions of defendant to some of the witnesses that purported to show by them that the victim had a bad general reputation for violence or like trait. There is no disagreement between the parties as to the controlling principle of law. They are in accord that if the evidence would support a verdict of not guilty under the defense of self-defense, such general reputation could be shown in evidence, but not otherwise. Both cite as authority: Collier v.State, 49 Ala. App. 685, 275 So.2d 364 (1973); McCaghren v.State, 52 Ala. App. 509, 294 So.2d 756 (1973); Body v. State, Ala.Cr.App., 329 So.2d 650 (1976); Harrison v. State, Ala.Cr.App., 342 So.2d 429 (1977).
 "To excuse one charged with murder on the ground of self-defense the accused must neither have provoked nor encouraged the difficulty, and must at the time have been, or appeared to be, so menaced as to create a reasonable apprehension of loss of life or grievous bodily harm, and there must have been no other reasonable mode of escape. Ala. Digest, Homicide, Keynote 109, et seq." McDonald v. State, Ala.Cr.App., 340 So.2d 80, cert. denied 340 So.2d 84 (Ala. 1976).
As defendant was in her own home, it is clear that she was under no duty to retreat. There may be some doubt as to whether she was the aggressor. There can be no reasonable doubt, in our opinion, that on the occasion of the fatal incident she was not
"so menaced as to create a reasonable apprehension of loss of life or grievous bodily harm," and for that reason no jury issue was presented as to the defense of self-defense. However discreditable the victim's conduct may have been on the occasion of his death, he did not by word or conduct pose immediate danger to the life or limb of defendant. She may have become justifiably angry; understandably she became emotionally disturbed; by her own testimony she raises a serious question as to whether she intentionally killed her husband. However, the evidence affords no substantial basis for a reasonable conclusion that she intentionally killed him in self-defense.
Previous violence, real or threatened, will not excuse an intentional homicide. The conduct of the victim that would justify the exercise of the right of self-defense must be such as would manifest to the mind of a reasonable person a present intention to kill him or to do him great bodily harm. Cooke v.State, 18 Ala. App. 416, 93 So. 86, cert. denied, 208 Ala. 100,93 So. 824 (1922). The court was not in error in sustaining the State's objections to questions as to the reputation of the victim for *Page 1272 
peace and quiet and other similar traits of character.
Appellant complains that two exhibits, photographs, were submitted to the jury without their ever having been offered in evidence. Although the record indicates that the exhibits were exhibited to the jury, the record does not show affirmatively that they were taken into the jury room and considered by the jury during deliberations. During the trial appellant treated the photographs as if they had been offered and received in evidence. We have stated:
 "Ordinarily it is taken that if something is exhibited before the jury and seen by them then it can be treated as having been introduced in evidence." Batson v. State, 50 Ala. App. 83, 277 So.2d 359 (1973).
No ruling of the court was invoked as to the particular exhibits, and the court is not chargeable with error as to them.
We find no error in the record prejudicial to appellant, and the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328). His opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.