6 So.2d 32

**McALLISTER v. STATE.**

6 Div. 779.

Court of Appeals of Alabama.

Feb. 3, 1942.

F. F. Windham and Jas. L. Marshall, both of Tuscaloosa, for appellant.

Thos. S. Lawson, Atty. Gen., and Wm. N. McQueen, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The indictment in this case was filed on the 24th day of August, 1939. It charged the defendant (appellant) with the offense of transporting spirituous, vinous or malt liquors in quantities of five gallons or more, contrary to law. Under the Statute, Section 1, Acts of Ala.1927, p. 704, Code 1940, Tit. 29, § 187, the offense charged was a felony.

At the time of the filing, in court, of said indictment, the record shows, and this court judicially knows, that the Honorable Henry B. Foster was Judge of the 6th Judicial Circuit. The record discloses also that said Judge presided over the court at the term thereof when this indictment was returned and filed in said court. The trial was had on April 8, 1941, and resulted in the conviction of the defendant. Judgment of conviction was pronounced and entered, from which this appeal was taken.

Upon the trial of this case, there was no dispute about the fact that Bolton, a deputy sheriff, and the only State witness upon the trial, found more than five gallons of whiskey in the trunk of an automobile being driven by the defendant. As to this, Bolton testified: "I know the defendant. On the 3rd day of July 1939, when I first saw him, he was coming up Greensboro Avenue (in Tuscaloosa). I was going down Greensboro Avenue. I turned and followed him, and about half mile I pulled him over to one side and stopped him, and he said, 'I guess you want me for driving without a license tag,' and I said, 'No, Oscar, I want that fourth of July whiskey you have.' He said: 'I have not got any,' and I said, 'What about the trunk, is it locked?' He said, 'No.' I went and looked in it and found the whiskey in the trunk. Mr. McAllister made no objection at all to my searching the car when we stopped him on the road. He was driving a brand new Ford V 8 car that he had bought from Moundville Motor Co., and he told me he was trying it out and I think he had just bought it the night before at Moundville. The trunk was not locked. The car had 118 miles on it."

The defendant, in explanation of the foregoing testimony, and as a defense to the charge, testified as follows:

"My name is Oscar F. McAllister. I am some times called Freeman McAllister. I was raised at Buhl Alabama. My mother lives there now. This is my wife here now. My wife is a teacher in the Tuscaloosa

County Schools. At the time I was arrested, we were living on the West Place at Taylorville. We had our place in University Place rented out. I was arrested on the third day of July and we were living at Taylorville at that time. I had been working at the University.

"On the night preceding the afternoon on which I was arrested, my wife and my baby and myself had gone to Moundville. I drove a car down there and traded it in. The papers had not been executed, not all of them. I left the car that I went in down there. It was a Plymouth. I traded this car in on a Ford Sedan V8. It had a trunk on it. I made the trade with the Moundville Motor Co. I don't remember the man's name. I first decided to take a blue car and it was bent up a little and I said we might as well take a black one, and they drove it around to the front. The blue one had some dents in it. I did not have anything to do with the preparation of the car for trading. I did not see what was inside the car, only what was in the car. I never raised the trunk lid. It was about dark when we got there and it was eight or nine o'clock when we made the trade. I had no occasion to look into the trunk and I did not look into it at all. I don't remember how many cars was in the garage, but there were several sitting around it. There were not several people working in it at that time but there were several around it. I do not know how many cars were in there but I imagine about eight or ten. That is my best judgment. When they drove the car out for me to take charge of, my wife and little baby got into it. We drove up to town and stopped at the drug store and then went home. I think the car had been driven some fifty odd miles the best I remember, but I do not know who put those miles on it. We went back home from town and I imagine it was about eleven o'clock. I did not have the trunk lid up from the time I left there until I got home that night. When I got home I went to bed and stayed at home that night. Just my wife, the baby, and I was there. She was not teaching then as there was no school. All of the next morning I was around the house and came to town the first thing that afternoon. I ate dinner at home right around twelve o'clock. Sometime about dinner time I had a discussion with my wife about looking for a house. We had been talking to Mr. Head or Mr. Atwood at Kaulton about a house. The house we were in was only rented temporarily. On the occasion I was arrested I had started to Kaul Lumber Co.

My wife had taught school at Kaulton and she wanted to move back to that neighborhood. I saw the officers when they came down the street; when I first saw them they were about thirteenth or sixteenth street going down Greensboro Avenue. I was not making any effort to get away from them as I did not have a right to. I turned off the road where you turn near the A. G. S. depot to go to Kaulton. I was almost in Kaulton in the edge of town when the officers overtook me. I was driving at an ordinary gate, at about twenty miles an hour. Mr. Bolton accosted me and I said 'I guess you are after me about these plates,' and he said, 'No, I want the load of liquor,' and I said, 'I have no liquor,' and he looked in the car and said 'How about the trunk. Is it locked?' and I said 'I don't know' and he looked in and there was the liquor or something in the cans. I did not know it. I did not make any objections to his searching the car. I did not have any information that there was whiskey in the car at the time he searched the car or any time before that. That was in July and the case was set for trial, I believe, for September 20th, following that, in 1939."

Mrs. McAllister, wife of defendant, testified as follows: "I am Freeman McAllister's wife. I am now employed as a teacher in the Tuscaloosa County Schools and have been so employed twenty years. In the summer of 1939, Defendant and myself were living at Taylorville on the Greensboro road. We were renting from Mr. West. My school was out at that time. I have a home of my own in University Place, and I had it rented out. We had just been living there a short time. We did not rent for any definite length of time and the place was subject to be given up at any time that Mr. West wanted it. And when I rented it I told Mr. West I would not want it long as we were looking for a house. I went with my husband to Moundville on the afternoon before he was arrested, the baby and I. I don't remember what time we got there, but we had to turn on the lights coming back. It was in the summer time. There were several automobiles there in that garage. We looked at a blue car that we decided on and when we started to get in, one of the men who worked there discovered there was a little dented place on one of the fenders, and he did not want it to go out until it was fixed and there was a black one and we said why not take it. We did not look in the trunk of the black one. We looked at the upholstery. After we got in the blue car they suggested themselves that we take an-

other car and we took a black car. They drove it out and we got in it and drove off after we had gotten our things transferred from the other car. I never did look in the one that we drove off. We came on up to town and just drove around in town. The baby and myself was with Mr. McAllister all the time. We went to the drug store and got something to drink and just killed time after that. The Defendant stayed at home all night and left there after dinner the next day. We ate dinner at home about twelve o'clock. He left home right after he got through eating. He said he was going to see about a house. They told us to come back in a short time and there might be one vacant. We had previously had some dealings with Mr. Head. We talked to Mr. Atwood at the Commissary and he told us that there was no house vacant at that time. The next time I saw Defendant after that he had been arrested."

The State, through its witness Bolton, also undertook to show flight of the defendant. In this connection the record shows the following:

"The next time I saw him was after he had made bond. I saw him around here a time or two.

"At this juncture the State asked the witness the following questions.

" 'Do you know whether or not he left here?' The Defendant objected to the foregoing question, the Court overruled the objection, and the Defendant duly excepted. Then the State asked him, 'Did he leave here?' The Defendant objected to this question, the Court overruled the objection and the Defendant duly and legally excepted, and the witness answered, 'Yes, Sir,' whereupon the counsel for the State asked the witness the following question: 'How long was he gone, if you know?' The Defendant objected to this question, the Court overruled the objection and the Defendant duly excepted. The witness answered, 'He was gone several months.'

"Whereupon the Defendant moved the Court to exclude the above answers from the Jury. The Court overruled the motion and Defendant duly excepted. Whereupon the State asked the witness the following question: 'Did you arrest him when he was brought back here?' The Defendant objected to this question, the Court overruled the objection and the Defendant duly and legally excepted. The witness answered and said that he found him in Louisville, Kentucky. Whereupon the State asked the following question. 'Did you and Mr. Huff go for him?' Defendant objected to this question, the Court overruled the objection and Defendant duly excepted. The witness answered, 'Yes, Sir, and we brought him back.' "

And on cross-examination the witness Bolton testified as follows: "I think he was here when his case was called the first time but I do not know the date when it was first called. I don't know whether it was called for trial on the 20th day of September, 1939, or not. When we found him he was working for Dupont de Nemours Powder Co. * * * I think Judge Foster was living at that time, on September 20th, 1939, but would not be positive. I don't believe I recall hearing Judge Foster tell him at that time that he could go ahead. I don't know whether he told him that or not. I couldn't say whether or not he told him to go ahead that the case would be taken care of. Mr. McAllister made no objection at all to my searching his car when he stopped him on the road. * * * Mr. McAllister gave me no trouble in any way when I went to get him, and he paid his own expenses back here and he drove his own car back and Mr. Huff drove ours."

The defendant strenuously denied that he, at any time, fled from the community. As to this, among other things, he testified:

"The case was set for trial, for September 20th, 1939. Prior to September 20th, Mrs. McAllister and myself went up and saw Judge H. B. Foster. He was Judge of the Circuit Court at that time. We saw him in his office. I explained the facts in the case to him and explained exactly how it was and he said, 'Go ahead until the day of the trial and I will take care of it and there will be nothing to it.' Then following that conversation we had there with Judge Foster I appeared here in Court on the day the case was set for trial, and I again had a conversation on that day with Judge Foster in the record office and he said, 'Go on and go to work and forget it. I will take care of it.' Following that I left here to go to work. Since that time I have been with the E. I. Dupont Company. I have been working for some time with this company at Charlestown Indiana under Civil Service. At this juncture witness was presented a letter from the E. I. Dupont de Nemours & Company dated January 17, 1941, addressed to Oscar F. McAllister, showing his present employment. Witness stated that he was employed there and had been for some time. Witness

further stated that letter presented him was dated at Charlestown, Indiana, on January 17, 1941, addressed to Mr. O. F. McAllister, Carpenter Foreman, #102. Witness said he received the letter shown him, whereupon the Court stated, 'I don't believe the letter would show it until it was from some official of the Court. The letter will not be admissible, and I will sustain the State's objections to you asking questions about them unless the letters are from the Court here. If you have any other letters from the Court or some official, I will admit them.' Whereupon Defendant reserved exception to the ruling of the Court. Whereupon counsel for Defendant stated, 'You will not object to our identifying them?' whereupon the Court stated, 'If they are from some official of the Court.' Whereupon counsel for Defendant stated to the Court, 'We offer the letter purely and solely and limited to the question of flight.' The State objected to the foregoing statement and to the introduction of the letters. The Court sustained the objection and Defendant duly and legally excepted. Whereupon counsel for Defendant stated, 'This letter is dated January 17, 1941, and we ask that it be made Exhibit A to the Defendant's testimony.' "

The letter offered in evidence reads as follows:

"E. I. Du Pont De Nemours & Company
"Incorporated
"Wilmington, Delaware
"Date, January 17, 1941
"Mr. Oscar F. McAllister
"Dear Mr. McAllister:

"This letter will serve to record the understanding that you will be reimbursed for the following expenses and losses incident to your transfer from Memphis, Tennessee to Charlestown, Indiana, which costs and expenses will be charged to the performance of the Government contract covering the construction and operation of the Charlestown plant:

"1. Cost of transportation for yourself from Memphis, Tennessee to Charlestown at the beginning of your employment at the latter location, and from Charlestown to Memphis, Tennessee, at the end of such employment.

"2. Living expenses (meals and lodging for yourself until you are able to obtain a permanent place of residence at or near Charlestown, not to exceed 15 days (unless for compelling reasons a longer time is required to obtain a permanent residence, in which case you will be required to obtain approval of your immediate superior and the final approval of the Head of your Department); and similar living expenses in obtaining a new place of residence at the end of your employment at Charlestown.

"5. The foregoing understandings, insofar as they apply to transportation and living expenses at the end of your employment at Charlestown, will not apply in the event of your voluntarily leaving the employ of the Company or of your discharge or transfer from that location because of unsatisfactory services.

"In order to complete our records, we should appreciate your confirming this understanding by signing and returning the enclosed copy of this letter.

"Very truly yours,
"Assistant Chief Engineer
"Accepted, 2/11, 1941
"Oscar F. McAllister."

Witness continued to testify: "I have not had any notification since I was talking to Judge Foster out there in his office. I did not know that there was any case against me until I was arrested in Louisville, Kentucky. I was laboring under the impression of the information that I got from Judge Foster. I never ran off from any case here against me, and I was here on the first day that the case was set and it never was tried or offered to be tried that day, and I was here for the purpose of trial if need be. I was here when the case was called for trial in September, 1939, and since that time I have been back here on several occasions and visited my wife. She has been teaching at Echola. I am a carpenter foreman with Dupont Company in the Service Department. I handle the whole Service Department and have been there about eleven months. * * * Since the first time this case was set for trial we stayed around town for a couple of months and down at my wife's mothers. I have visited her in the Northern part of the county where she was teaching at Sterling. * * * I did not inquire about my case at that time because I thought it was settled. I did inquire about it before September 20th, 1939. After I left here I did not ask about my case. I did not have a right to. My wife did not say anything about it at all. I visited her before that several times during the year, year before last, 1939. I had said nothing to nobody around here about my case. * * *

At this juncture counsel for Defendant stated to the Court, 'We offer these same papers again for this purpose and also this badge for the purpose of showing that Oscar F. McAllister and Oscar Freeman McAllister is one and the same person and also for the purpose of corroborating his testimony as to the fact that he never fled from justice or from this case.' Witness continued to testify and stated that, 'Oscar F. McAllister is correct and my name is shown on my letters and correspondence between me and the Dupont Company. My name, Oscar F. McAllister, is shown on the letter to me on January 17, 1941, giving me further instructions, and which name I had been employed for some time.' Again Defendant offered these Exhibits, above referred to, for the purpose of showing that he gave the same name up there that he used in Tuscaloosa County. The State objected to the introduction of these Exhibits. The Court sustained the objection, and Defendant duly excepted."

In corroboration of the foregoing testimony of defendant, Mrs. McAllister testified as follows: "I went with the Defendant up to Judge Foster's office a short time before the case was set in September. His office at that time was down the hall in the Court House. My husband and I went around there to see him. At this juncture counsel for Defendant asked the witness the following question: 'Do you remember what was said at that time. First I will ask you if Mr. McAllister told Judge Foster the facts about the case?' The State objected to this question. The Court sustained the objection and the Defendant duly and legally excepted, and offered to show that after he told him the facts, Judge Foster—Here the Court interrupted counsel for Defendant and stated, 'Understand, I am not ruling out what Judge Foster said, but about the facts in the case. I am offering to let you show any statement which Judge Foster said to him about leaving here, but you are asking about the facts in the case.' The Defendant reserved exception to the Court's ruling. Witness continued to testify and stated that, 'Judge Foster told him he had a job now, to go to it; that he would see after this up here.' * * * Witness continued to testify and stated that, 'Judge Foster told her husband to go on to work if he had a job. * * * I never discussed with my husband anything about there being a forfeiture taken on the bond. * * * He was here when his trial was set on the 20th of Sep-

tember, 1939.' The witness stated that, 'He was acting on the assumption that there would not be any more to it and she was not here in Court that day as I did not think there would be anything to it after Judge Foster said he was going to take care of the case.' "

It is clearly apparent from the foregoing that the question of the alleged flight of defendant, which question had been injected in this case by the State, was of paramount importance, for if the defendant's insistence and evidence was true his case should not have been burdened by this hurtful and damaging question. The applicable rules of evidence as to flight have been discussed and determined in innumerable instances by this court, and by our Supreme Court. But it appears that the trial court, in this case, in its oral charge to the jury refused, or refrained, from instructing the jury, in any manner, as to the rules of law governing the alleged flight of the accused. The court also refused certain written charges requested by the defendant on this question. Hence, the jury was given this case to consider and determine without any knowledge of the law as to how such evidence could or should be weighed or considered. It is the law that in a prosecution for crime, it is permissible for the State to offer proof of the alleged flight of the defendant from the neighborhood of the crime as a circumstance tending to show the guilt of the accused. But, where a crime has been committed, and proof of flight of the accused is offered, or evidence tending to show that the defendant absented himself from the community in which the alleged crime was committed, the probative force, or the value of the fact of flight depends entirely upon the purpose of the defendant in thus absenting himself from the community. The question as to why the defendant left the community and remained away from it becomes a question for the jury; therefore, when the state offers proof tending to show that the defendant fled from the community, it is permissible under the rules of evidence to allow both the state and the defendant to show all those things which the defendant said and did when he left, and while away from the community, which tend to explain his flight, the quo animo thereof; whether the absence of the defendant was due to a sense of guilt, or his desire to avoid arrest, or through fear of arrest, or,

on the other hand, whether his absence was due to other causes. Flight means, as a rule, when used in connection with a prosecution for crime, that the defendant absented himself from the community of the crime out of a sense of guilt, out of fear of, or to avoid, arrest, and, as stated, any word or act of the defendant while in flight—i. e., while away from the neighborhood of the crime—tending to explain the reason for his absence, is admissible as a part of it.

 Of course the defendant, under this rule would not be permitted to get before the court or jury his declaration that he is not guilty of the crime as this would clearly come within the rule against allowing self-serving declarations; but the evidence which a defendant may offer on this question, as tending to rebut the idea that his absence was in fact a fleeing from justice, are such acts and declarations of his while absent which may tend to show that his absence from the community was due to an entirely different cause. In other words, when flight is offered as a circumstance tending to show the guilt of defendant, the important question is as to whether, during his absence, the defendant is to be regarded as having been a fugitive from justice, or whether he is to be regarded as having been absent for an innocent and lawful purpose disassociated with any idea of the crime. Gilbert v. State, 20 Ala.App. 28, 100 So. 566.

After the jury had retired and deliberated on the case for a long time, they returned to the court room, and the court stated: "Gentlemen, have you been unable to reach a verdict?"

The jury replied: "We have failed to reach a verdict."

The court stated:

"Is there some hopes of your getting together? This seems like a case the Jury ought to get together on. I know sometimes men honestly cannot agree, but it is highly important, if it is possible at all for you to reach a decision in this case. Don't you believe if you stay a little longer, that you can get together. What is your opinion?"

Mr. Steele, one of the jurors: "I don't think so."

"The Court: 'Are you standing like you did when you first went out?'

"Mr. Steele: 'Yes sir.'

"The Court: 'Is it a question of law or of fact that divides you?'

"Mr. Steele: 'It is a question of fact.'

"The Court: 'Of course the question of fact is entirely in the province of the jury.'

"Mr. Steele: 'Can you give us any instruction or information about the penalty?'

"The Court: 'The Court fixes the penalty, from one year to a maximum of five years for transporting more than five gallons of liquor. Gentlemen, suppose you make one more little effort while we are finishing this case we are now on. We are on a case that it will not take long to get through with. I don't want to punish you, but from the time it takes to try a case, to make one more effort, and if there is a minority, and see if you cannot reason it out and make one more effort to get together. I will not keep you long, because we will soon be through with this case, but please do your best to get together in this case.'

"The Jury retired and after further deliberations brought in a verdict of guilty as charged in the indictment, which verdict of the Jury reads as follows, to-wit:

"'We, the Jury, find the Defendant guilty as charged in the indictment, Frank P. Steele, foreman.'"

 Under the evidence in this case which disclosed, as stated, that the whiskey was found in the trunk of a car being driven by defendant, and the defendant's emphatic denial of any knowledge that any whiskey was in the trunk, and that he had never looked in the trunk, etc., presented a question for the jury to determine. And it appears to this court, had the jury been properly advised and instructed how the evidence of flight should and ought to be considered, a different verdict might have been returned by the jury. The testimony of the defendant and his wife as to the conversation they had with Judge Foster, then presiding, and his reply and instructions to defendant as herein above quoted was without dispute or conflict, and having been so admitted, the jury should have considered said testimony, which is apparent they did not do, for this evidence of itself, if believed by the jury, would have been a complete answer to the accusation that he fled from the neighborhood and that such flight was engendered from a consciousness of guilt.

All the questions herein discussed are fully presented in defendant's motion for a new trial. We are clear to the conclusion that error prevailed in the ruling of the court in overruling defendant's motion for a new trial.

 Under the authority of the case of Goforth v. State, 183 Ala. 66, 63 So. 8, the court committed reversible error in sustaining the State's objection to the introduction of the letter written to him by his employers the DuPont de Nemours & Company, transcribed herein above.

 There was also error in refusing to defendant the special written charges on the question of flight.

Other errors prevailed on the trial of this case, but we see no necessity of discussing these several other points of decision, for from what has been said, the judgment of conviction from which this appeal was taken must be reversed and the cause remanded. It is so ordered.

Reversed and remanded.