318 So.2d 782

**Ronald Keith CONNELL**

v.

**STATE.**

5 Div. 133.

Court of Criminal Appeals of Alabama.

May 7, 1974.

Rehearing Denied June 25, 1974.

**44**

Walker, Hill, Gullage, Adams & Umbach, Opelika, for appellant.

William J. Baxley, Atty. Gen., and John D. Whetstone, Asst. Atty. Gen., for the State.

der in the first degree with punishment fixed at life-imprisonment.

The record contains three volumes totaling 479 pages, all of which the writer of this opinion has read in his search for errors, as mandated by Title 15, § 389, Recompiled Code 1958. We are not convinced that the rulings of the trial court were free of prejudicial error as will be noted later in this opinion. Suffice it to say, the trial court, the District Attorney, and counsel for the defendant were all faced with some difficult questions, both in fact and law, that arose out of the factual and circumstantial evidence presented to the jury. It was not an easy case from a trial point of view.

The only witness present when the homicide charged in the indictment was committed was Mrs. Sharon Froney, wife of the victim. Mrs. Froney survived a knife assault committed by an assailant who was present when Mr. Froney was fatally stabbed with a knife or like instrument.

Mr. and Mrs. Froney temporarily resided near Tallassee, Alabama, where Mr. Froney was employed and temporarily stationed as a natural gas consultant. They lived in a camper, which was convenient for station to station traveling, which was Mr. Froney's occupational itinerary.

On the morning of January 26, 1972, Mr. and Mrs. Forney left for Atlanta in their camper on business. After transacting the business, they began their return motor journey, later in the afternoon, back to their station—the point of departure in Alabama. In traveling, they used I-85 between Atlanta and Montgomery, which had not been constructed between Newnan and Lagrange, Georgia. Between these points, the motoring public was compelled to use Highway U.S. 29, which was an interruption of I-85.

When they reached U.S. 29 on the return trip, Mr. Froney elected over his wife's protest to pick up four hitchhikers

**BOWEN W. SIMMONS**, Supernumerary Circuit Judge.

The homicide, which is the subject of this indigent appeal, was committed in Lee County wherein a grand jury indicted and a petit jury duly and lawfully impanelled convicted the appellant-defendant of mur-

who were importuning a ride. Everything went well for a period of time. There was no indication by the hitchhikers' dress or personal appearance that they were dangerous. Mr. Froney stopped in route and bought several cans of beer. The riders and their host partook of the refreshments.

The names of the riders were: Stephen Douglas Chase, Philip Robert Ronica, Karen Elaine Jordan, and Ronald Keith Connell, appellant-defendant.

The seating arrangement of the four was at a dinette table. All four of the riders were in close contact with each other. Connell sat down first on one of the beds to the rear of the camper, but later moved up to the front where all four sat at the dinette table. After they reached I–85 where it began leaving U.S. 29 in Georgia, Mr. Froney asked his wife to drive. Aboard the vehicle was a television set, a radio, and a tape player or stereo which they had been playing all the afternoon and into the evening.

Before reaching I–85 and after they had been talking for some time, Karen asked Mrs. Froney to turn up the volume of the stereo. She complied. The witness testified that, "I noticed for a while that they were just kinda excluding us from the conversation, just talking among themselves. And after another short while, Mr. Connell had requested I turn the music up a little louder, * * *." "The music was pretty loud, louder than usual but not so loud that they really had to shout to be heard." At that time, the witness Mrs. Froney was occupying the passenger seat. All four of the hitchhikers were sitting at the dinette table behind the witness. At the time the music was turned up the second time at Connell's request, the four were still talking in hushed tones—"not talking to us any longer." As already stated, when they reached I–85 Mr. Froney asked the witness to drive. She took over and continued to drive for some time going in the direction of Montgomery. The witness and her husband decided it would be nice to take the passengers on to Montgomery instead of dropping them off on the roadside.

After driving for a short while and after they were in Alabama, the witness requested her husband to drive so she could go to the bathroom. They changed places and the witness went to the bathroom. The hitchhikers were all sitting in the same places.

After the witness was in the bathroom a short while, about a minute, "all of a sudden I felt the motor home kinda slow down very fast and pull off the road in a very hurry suddenly." The witness then opened the bathroom door and "saw the three boys were huddled over my husband, kinda in that position, kind of over him. He was turned around in the driver's seat at this time, looking up at them. And so I remember him saying, 'Take our money, take the motor home, but just leave us alone.' And this is the last thing I did hear him say. He was just looking very panicky; looking up at the three people hovered over him."

The witness further testified that the defendant, Connell, was one of the three still hovered over her husband at the time her husband said, "Take our money, take our motor home, just leave us alone." The witness was so positioned then that she could see her husband, but not the boys. She did not see a knife. Karen Jordan was standing between her and the three boys. Karen pointed a knife at the witness and told her to take it easy.

The witness then became panicky and sat down on one of the three beds—she could not help her husband. She sat there for a while, until one of the boys came back and directed her to go to the bathroom. As she was proceeding as directed, she felt a blow on her shoulder which knocked her to the floor. After entering the bathroom and locking the door, she felt a wetness on the shoulder, which was blood.

After being in the bathroom for a short while, she heard a couple of voices, one of

which said, "well, kick the door down." One of them did kick the door in and grabbed the witness by her wrists and pulled her to her feet and then to the bed in the aisle. The witness further testified that she was then directed to put her hands behind her back, where they were tied with a white handkerchief. She did not know which one did this. Following further orders, she lay down on the bed where a pillow was put over her head. One was trying to suffocate her. She struggled and both fell on the floor. The witness fell on her stomach. It was then that she felt a sudden sensation in her back. She could feel the knife coming down on her back, and after the six blows, she stopped struggling and pretended she was dead. Someone then placed a blanket over her.

The motor vehicle started up and someone told Karen to drive. They were all talking and one of them said "well, we'll have to get rid of the motor home some way—". Various ways of disposing of the vehicle were discussed. The suggestion was made to burn the vehicle and thus get rid of the evidence.

The camper then began to travel over smooth surface and continued to do so for some time. Then the vehicle began swaying on a rough road. Finally the vehicle came to a stop, and the people were moving around. The witness remained quiet for about ten minutes and was worrying about the smoke that was filling the room. When she got up, her husband was lying on the floor dead. It was night and the lights in the vehicle were on.

Mrs. Froney, suffering from knife wounds and in a weakened and exhausted condition, started walking up a dirt and deserted road and came to a fork, whereupon she took the right fork and walked for a while until she could hear traffic. She then turned around and took the left fork until she reached a very busy highway. Finally, a patrol car and another car stopped. Two patrol officers got out of the patrol car. One of the officers was later made known to Mrs. Froney to be Trooper B. G. Brown. The witness testified that she told the officers where the camper was located. Thereupon the officers put her in the other car and asked the occupant, a Mrs. Holston, to drive her to the hospital. Mrs. Holston responded and took her to the East Tallapoosa Hospital.

The record is replete with activities of law enforcement officers in conducting an intensive and extensive investigation as to the identity of the hitchhikers and their whereabouts. Also, a minute search of the camper and the area of the crime to obtain evidence pertinent to the commission of the homicide and the attack on Mrs. Froney was conducted. The investigation reveals sufficient probable cause that pointed to the identity of some, if not all four of the hitchhikers, who were arrested pursuant to a federal fugitive warrant issued under federal authority. The arrest of the four hitchhikers took place in Del Mare, California, by ten FBI officers.

The officers took possession of a pair of boots, knives, sheaths and other articles which were in the room and in view of the officers. The articles were in the room occupied by the hitchhikers.

These articles were brought back to Alabama, and after sequence of possession was established, they were introduced and admitted in evidence on the condition of the prosecution that they pointed to the guilt of appellant.

It will unduly lengthen and burden this opinion to delineate all of the evidence leading to the apprehension and arrest of the four persons in the motel room. These articles of clothing and the knives were all relevant and properly admitted into evidence at the trial of the defendant. Suffice it to say, the investigation seemingly was thorough and efficient and brought results from which an indictment of defendant was returned. The defendant was tried separately from the others.

We will now advert to the pleading and procedure after indictment and preliminary to the trial. We will also address the contentions of the defendant during the trial and set forth in the defendant's exhaustive and comprehensive brief.

### I.

The defendant timely filed a motion to quash the indictment for that at the time of the alleged commission of the offense named in the indictment, he was only 21 years of age; that the Constitution of the United States and of the State of Alabama affords him protection which entitled him to have the indictment returned by a grand jury properly and legally drawn from a jury box composed of a fair cross-section of eligible jurors from Lee County; that he was denied this right in that young people of the age of 25 years and younger were not fairly included in the jury box, but on the contrary were systematically excluded therefrom, "and indeed all eligible jurors between the ages of 18 years and 21 years were completely excluded from said jury box from which the grand jury which indicted the defendant in this case were selected or drawn."

■■ The trial court promptly, without a hearing, overruled the motion although it was timely filed and presented to the court. Under many factual circumstances, the defendant, as here, is entitled to a judicial hearing on his motion. However, under applicable law, we think there was no error in overruling defendant's motion without a hearing.

It is to be noted that the motion embraces young persons between ages 18 and 20 inclusive and also those between ages 21 and 25 inclusive, and alleges that they were systematically excluded from the jury roll or box from which the members of the grand jury returning the indictment were drawn.

The legislature in Title 30, § 21, Recompiled Code 1958, as amended, appearing in the pocket part of volume 8, prescribed the qualifications of persons on a jury roll and excusing certain persons from service. Persons under 21 years were specifically excluded from such service.

■ We do not think the enfranchisement of persons between the 18 and 21 years of age affected, repealed or modified the age restriction, supra, so as to mandate eligibility for jury service of this age group, namely, between 18 and 21 years of age. Legislative action is necessary to change the eligibility of jury service of this group.

The United States Supreme Court in *Carter et al. v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L. Ed.2d 549, observed:

"* * * It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. 'Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.'

"Statutory provisions such as those found in § 21 are not peculiar to Alabama, or to any particular region of the country. Nearly every State requires that its jurors be citizens of the United States, residents of the locality, of a specified minimum age, and able to understand English. Many of the States require that jurors be of 'good character' or the like; some, that they be 'intelligent' or 'well informed.' "

■ The states remain free to confine the selection to citizens, to persons meeting

specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character.

Further observations of the Supreme Court in *Carter* with reference to § 21, supra, although some may be pertinent, are not necessary to this opinion. In *United States v. Olson*, 8 Cir., 473 F.2d 686, the Court there made an observation which we think has application to defendant's motion.

"In sum, there is no support in law or logic for the proposition that the right of jury service is a concomitant subsidiary of the franchise. Accordingly, we reject appellant's contention that the Twenty-Sixth Amendment ipso facto rendered unconstitutional the twenty-one year minimum of 28 U.S.C. § 1865(b)(1)."

We hold that § 21, supra, of the Alabama Code, is not abrogated or modified with respect to the exclusion of persons under twenty-one years of age from jury service. We quote pertinent observations of the Eighth Circuit in *Olson*, supra;

"The true basis of a challenge to the master list in this case must rest on the allegation that the compilation of the list excluded an identifiable community group, to wit: persons aged eighteen to twenty. Of course, '[n]either the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group.' *Swain v. Alabama*, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). However, since a jury is designed to 'express the conscience of the community,' *Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), '[t]he American tradition of trial by jury . . . necessarily contemplates an impartial jury drawn from a cross-section of the community.' *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). Thus, juries must be indiscriminately selected 'without systematic and intentional exclusion of any . . . substantial portion of the community . . . that cannot be . . . excluded in whole or in part without doing violence to the democratic nature of the jury system.' Id., at 220, 223, 66 S.Ct., at 985. This command flows from the requisites of both Due Process, *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (plurality opinion of Mr. Justice Marshall), and the Sixth Amendment, *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

"Accordingly, the dispositive question is whether persons aged eighteen to twenty compose an 'identifiable group' which cannot be systematically excluded from jury service without rendering juries nonrepresentative of community attitudes. But appellant has 'failed to show that the attitudes of this group [18–20] are inadequately represented by those several years older than they, that is, that eighteen to twenty-one year olds are a distinct, cognizable group.' *United States v. Deardorff*, 343 F.Supp. 1033, 1043 (S.D.N.Y.1971). 'The difference in viewpoint between ages [18–20 and 21–25, for example,] . . . . would not seem to us of any great significance. . . . We regard it as highly speculative whether the decisional outlook of such excluded persons would be different than that of persons a mere few years older . . . .' *King v. United States*, 346 F.2d 123, 124 (1st Cir. 1965). Accordingly, we hold that persons aged eighteen to twenty are not an identifiable group the exclusion of which renders a jury list nonrepresentative of the community and violative of the Fifth and Sixth Amendments. * * *"

█ In harmony with the aforementioned pronouncements in *Carter* and *Olson*, supra, we hold that the persons of 18–25 in age mentioned in the motion are not an identifiable group, and their exclusion does not support the defendant's motion to quash; that the failure to grant a

hearing on the motion was not a reversible error. Neither was it error to overrule same.

## II.

Appellant-defendant next asserts that the trial court committed error in refusing to allow his counsel to see notes which the witness for the state had in his hands during direct and cross-examination.

This assertion refers to Trooper B. G. Brown, a witness for the state. We think it is clear from the record that the witness had some notes in his hands when he was testifying; also that the witness did not refer to these notes or in any manner refresh his recollection therefrom while so testifying. There was no proof to the contrary.

This court held in *Robinson v. State*, 49 Ala.App. 511, 273 So.2d 487, that it was within the trial court's discretion to order or not to order a witness to permit defendant's counsel to inspect a note or notes which the witness did not take with him to the witness stand, but referred to them outside the courtroom immediately before testifying.

In the instant case, the witness had the notes in his hands but as we have stated, he did not refer to them. The discretionary rule in *Robinson*, supra, would at least here have application if no more. There is no merit in defendant's insistence of error to reverse because the trial court refused to order the inspection.

## III.

Defendant next insistence is that the trial court erred in refusing to allow defendant's counsel to cross-examine the prosecutrix, Mrs. Froney—the surviving wife of the homicide victim, regarding her prior statements.

In order to insure accuracy of a stipulation of the parties and a colloquy between counsel for the defendant, Mr. Walker, the District Attorney and the trial court, we quote at length from the transcript:

"Mr. Walker: It is stipulated by and between the parties that the Sheriff of Lee County did participate, along with Captain Herman Chapman, and others, in taking an oral statement from Mrs. Sharon Froney by tape recording device, while she was in the East Tallapoosa Hospital at Dadeville, Alabama, on January 27th, 1972, and that that taped interview was transcribed and furnished, by agreement of the parties, to counsel in this case and that this was the taped interview, so transcribed, that counsel had in his hand when he was attempting to interrogate Mrs. Sharon Froney therefrom, on the first day of the trial.

"Mr. Wright: Now, we are not stipulating that the statement as typed, is a correct statement insofar as to what she actually said to them.

"The Court: Let the record show that this statement was examined by the Court. It is not signed by Mrs. Froney, Sharon Froney, and she testified that she had never seen it and never read it after it was transcribed. She further testified that she was under sedation on January 27, 1972, at the time that statement was taken; that it was a statement by her; it was notes and memoranda made by the Sheriff.

"Mr. Walker: As I understand it, it was what she said, taped by the man.

"The Court: Well, it was still the notes and memoranda by the Sheriff, rather than a statement, in the opinion of this Court.

"Mr. Wright: Of course, I would like the record to show that there are things mentioned in that writing, in that memorandum, that are not the statement of Mrs. Sharon Froney.

"The Court: That's true.

\* \* \* \* \* \*

"The Court: The Court would not permit the defendant to cross-examine from this statement which has been referred to, due to the fact that it was notes or memoranda made by the Sheriff and that the statement was not signed by Mrs. Froney and he said that she had never seen the statement and never read it, and the Court cited two cases at that time, *Mabry versus State*, [40 Ala.App. 129,] 110 So.2d 250; cert. den., [268 Ala. 660,] 110 So.2d 260. The other case being *Parker versus State*, and I will supply the Court Reporter with that book and page [266 Ala. 63.] 94 So.2d 209."

As we read the record, defendant's counsel was not undertaking to introduce the transcription or any of the notes in evidence, but was trying to elicit from the witness certain statements appearing in the transcription and to refresh her recollection.

We pretermit deciding that the defendant having laid the proper predicate, as he did, would not have been entitled to offer impeaching evidence by the officers as to what the witness told them. The transcription, although not signed by the witness, was available to the defense for use in impeaching interrogation.

It appears to us that the defendant was precluded by the trial court from cross-examining the witness fully with respect to her statements to the officers and was denied the right to formulate his questions by use of the officer's notes and the transcription, or to use said notes and the transcript as a memoranda and guide in conducting the examination.

This court held in *Bailey v. State*, 24 Ala.App. 339, 135 So. 407, that the prosecuting attorney had a right to refer to "grand jury notes" in formulating questions on cross-examination of adverse witnesses.

The Supreme Court of Alabama held in *Parker v. State*, 266 Ala. 63, 94 So.2d 209,

that the trial court in a homicide prosecution would not be put in error for permitting the solicitor to cross-examine the defendant from written transcript of tape recorded statements made by the defendant to the police, soon after the fatal shooting, where the transcription was not admitted into evidence or authenticated in any manner by the defendant.

The trial court stated:

"The Court: Well, I'll tell you. I think I'll just take the bull by the horns right now and say that you can't ask her any more questions from that statement, any more questions from that statement."

The defense counsel made known to the trial court that he was trying to refresh the recollection of the witness and elicit, if he could, certain statements which she omitted to tell on direct examination; that he was not trying to use the transcription or notes as impeaching evidence. In fact, the defense counsel offered to show the witness the transcription, but in no instance did he try to introduce the notes or the transcription into evidence.

We conclude that the court committed reversible error in precluding the defendant's counsel from cross-examining the witness, the only eye-witness who testified, while using the transcription and notes as a guide in so doing.

## IV.

■ Defendant further contends that the trial court erred in charging out insanity as a defense to the alleged crime.

As we view the record, the defendant adduced evidence by competent and credible witnesses that he was mentally retarded, was meek and amiable as a child; that he had no propensity to fight or engage in physical combat with others, when he was growing to manhood; that he was slow to reason and very retarded in planning.

There was no testimony that this mental condition was due to a diseased mind. Neither was there any testimony adduced under the insanity plea that met the mandates of *Parsons v. State,* 81 Ala. 577, 2 So. 854, which is the bedrock case on insanity in Alabama. The burden to prove his insanity plea was on the defendant. Title 15, § 422, Recompiled Code 1958.

## V.

 A fifth contention is that the trial court erred in refusing to give the defendant's requested charges in writing relative to manslaughter in the first degree; also the court declined to instruct the jury on said manslaughter.

We conclude from the record that the defendant was guilty of murder and not any other offense embraced in the indictment. The evidence of the only eye-witness to the crime, Mrs. Froney, was that the homicide was cold-blooded and without excuse or justification committed to effect a robbery of the victim Mr. Froney and the witness. The defendant did not take the stand, neither did any of the other three alleged participants appear as a witness for the defendant. There was no error in the refusal of the trial court to give the defendant's written charge on the elements of manslaughter in the first degree. *Ragsdale v. State,* 134 Ala. 24, 32 So.2d 674; *Booth v. State,* 247 Ala. 600, 25 So.2d 427. When the state's evidence, as here, made out a case of unprovoked and cold-blooded murder, and the defendant offered no evidence, the trial court properly refused the defendant's requested charge as to the reduction of the grade of homicide to manslaughter. If the defendant was guilty, there was absolutely nothing in the evidence to reduce the crime below murder and the court properly refused the written charge relating to manslaughter. *Snead v. State,* 251 Ala. 624, 38 So.2d 576(14).

## VI.

 Defendant asserts that the trial court committed reversible error in allowing an FBI agent, Thomas J. McCrystal, to testify about contents of a teletype without accounting for the absence of the original. There were no grounds given for this objection. The ruling on the objection is not reviewable. *McKanney v. State,* 51 Ala.App. 529, 287 So.2d 240(3); *Alabama Great Southern R. Co. v. Sanders,* 145 Ala. 449, 40 So. 402; *Southern R. Co. v. Jordan,* 192 Ala. 528, 68 So. 418; *Harvey v. Bodman,* 212 Ala. 503, 103 So. 569(7); *Conway v. Robinson,* 216 Ala. 495, 113 So. 531; Alabama Digest, Volume 2, Appeal and Error ⚖231(3).

## VII.

 Defendant's next contention is that the court committed reversible error in refusing to allow the defendant to cross-examine the FBI agent on matters about which the witness testified on direct examination.

We think it is reasonably clear from the testimony of the witness that the teletype message, the subject of the cross-examination of the witness, was a governmental message from the FBI office to the agent, containing confidential information not subject to disclosure. It appears from direct examination that the teletype message was related to the defendant and his arrest along with the others. It is inferable from the evidence that the message contained confidential information that was not subject to disclosure on cross-examination. Such disclosure on cross-examination was not permissible. *Parsons v. State,* 251 Ala. 467, 38 So.2d 209.

## VIII.

 The next question for consideration is whether or not the court, when the state rested, erred in overruling the de-

fendant's motion to exclude the evidence. This motion and ruling brings into focus whether or not there was sufficient evidence adduced by the state which would sustain the jury's verdict that the defendant was guilty of murder as charged in the indictment. The only eye-witness to the homicide, for which the defendant was tried and convicted, was Sharon Froney. The other witnesses, of course, were the alleged accomplices.

 Omitting at this juncture repetition of the evidence, supra, relating to events prior to the actual slaying, we advert to testimony, which in our judgment sustains the implication and inference that the defendant was a principal in the slaying, although there is absent any direct proof as to which of the three men present in the motor vehicle actually wielded the knife to effect the victim's death.

It appears to us from the evidence that this defendant, Connell, was huddled with the other two men in deep conference, which was a prelude to the knife attack on the victim; that the knife was wielded by one of these three men; that the defendant, Connell, was huddled over the victim with the other men when the victim pleaded to them to leave him alone, or words to that effect, and to take the motor vehicle and go ahead. It was at this time that the knife was being wielded and in such a manner as to cause the death of Mr. Froney.

 We hold that the jury could draw a reasonable inference from the secretive conference by the three men and their huddle over the victim that the defendant was an accomplice to the homicide.

The guilt of the defendant would not have to be established as to his having actually wielded the deadly weapon. Title 14, § 14, Recompiled Code 1958. In *Jones v. State*, 174 Ala. 53, 57 So. 31, our Supreme Court quoted with application a principle in *Morris v. State*, 146 Ala. 66, 41 So. 274, 280, as follows:

"When by prearrangement, or on the spur of the moment, 'two or more persons enter upon a common enterprise or adventure, and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist, the active perpetrator in the commission of the offense, is a guilty participant, and, in the eye of the law, is equally guilty with the one who does the act. Such community of purpose, or conspiracy, need not be proved by positive testimony. It rarely is so proved. The jury are to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case.'"

In *Jones*, supra, the Supreme Court further observed:

"Aid and abet 'comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary. No particular acts are necessary. If encouragement be given to commit the felony, or if, giving due weight to all the testimony, the jury are convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, then that ingredient of the offense is made out.' *Raiford's Case*, 59 Ala. 106; *Tally's Case*, 102 Ala. 65 et seq., 15 South 722."

We also quote from *Commonwealth v. Ventura, et al.*, 294 Mass. 113, 1 N.E.2d 30, wherein it appears that Ventura and three others were convicted of second degree murder. There was no evidence as to which defendant inflicted the death blows. The appellate court observed:

"The evidence warranted a finding of concerted action on the part of all the

defendants in going to the remote place when the murder was committed on the afternoon of October 3, 1934, and that they all were in a position to render assistance in the commission of the crime. There was evidence of separation after the murder and a gathering in Boston late in the evening. The contradictory statements made by the several defendants and the possession by one of them of an implement like one by which it might have been found by the jury that a mortal blow was inflicted upon the murdered man were highly significant. A verdict of guilty of murder in the second degree was warranted on the evidence. There was no error in denying the motions for directed verdicts in favor of the defendants. * * *"

We also refer to our recent case of *Lee v. State,* 51 Ala.App. 332, 285 So.2d 495.

It is to be noted that all four of the hitchhikers fled the scene of the homicide and were apprehended in a motel in Del Mar, California. Also discovered in the room with them were several other articles taken from the camper where the homicide occurred. It is not shown that the defendant transported these articles, but they were part of the res gestae removed by one or all of the hitchhikers from the camper. ▆ Evidence of flight of a defendant from the scene of the crime is admissible as a circumstance to show guilt. *Walters v. State,* 24 Ala.App. 370, 135 So. 600; *McAllister v. State,* 30 Ala.App. 366, 6 So. 2d 32; *Lance v. State,* 28 Ala.App. 571, 190 So. 108; Alabama Digest, Volume 6, Criminal Law, ☜351(3).

We conclude that the trial court did not err in declining to exclude the evidence. The guilt or innocence of the defendant was a jury question.

## IX.

It appears that the court gave a very comprehensive oral charge; also he gave eight written charges requested by the defendant and refused thirty-one. We have reviewed each of the thirty-one refused charges, and it is our opinion that they were correctly refused, for that they stated either an incorrect principle of law, were inapplicable to the evidence in the case, were abstract, or were substantially covered by the oral charge and the given charges. We omit discussing the individual charges because it would extend this opinion beyond reasonable length. We particularly refer to the request for the affirmative charge as being correctly refused. The guilt or innocence of the defendant was a jury question.

Because the trial court restricted the defendant's cross-examination of the state's only eye-witness, Mrs. Froney, relating to the stipulated transcribed statement taken on a tape recorder by certain officers of the law, it is our opinion that the trial court committed reversible error. The record otherwise is free of error.

It is ordered that the judgment of the court, convicting the defendant, be and the same is hereby reversed and remanded for further proceedings.

The foregoing opinion was prepared by the Hon. BOWEN W. SIMMONS, Supernumerary Circuit Judge, serving as a judge of this Court under § 2 of Act No. 288, July 7, 1945, as amended; his opinion is hereby adopted as that of the Court.

Reversed and remanded.

CATES, P. J., and ALMON, TYSON and HARRIS, JJ., concur.

DeCARLO, J., dissents.