The appellant was indicted for the first degree murder of Taylor Oates, Jr., by "stabbing him with a knife." At trial the appellant was found guilty of first degree *Page 1333 
manslaughter, and his punishment was fixed at ten years imprisonment. The trial court then entered judgment in accordance with this verdict. The appellant's motion for new trial was overruled following a hearing thereon.
The incident giving rise to this indictment took place on the evening of September 23, 1974, in a field beside what used to be Brent Elementary School, but now serves as the community recreational center [R. 122].
The State's first witness, Robert Lee Moseley, Jr., testified that he was present at the old Brent School on the night in question. He stated that he saw the appellant and the now deceased, Taylor Oates, Jr., engaged in an argument, but because he was some distance from them, he could not hear much of their heated conversation. Robert Lee Moseley did testify that he saw the appellant and Oates "passing a few licks," and that subsequently Oates turned and began walking away from the appellant. The witness stated that the appellant began following Oates, and that Oates warned the appellant "if he kept following him he was going to whip his ass" [R. 73]. Moseley said that the argument flared up again and that Oates broke off the argument once more by turning and walking away from the appellant. The witness testified that the appellant then threw a beer can at Oates and once again an argument began. Moseley stated that it was during this confrontation that the appellant stabbed Oates [R. 73]. Moseley testified that Oates, after being stabbed, walked over to his car where he and several others then took Oates to the Bibb County Hospital [R. 75]. Moseley stated that Oates could not get treatment at the hospital, therefore he requested that an ambulance be called to take Oates to Druid City Hospital in Tuscaloosa, Alabama. Moseley stated that the ambulance arrived about twenty-five minutes later.
James Hill testified that he also witnessed the argument between the appellant and Oates [R. 91]. Hill stated he could not hear everything that was said, but did testify that he heard Oates tell the appellant, just before Oates was stabbed, that "I ain't got nothing in my pockets but a set of keys" [R. 98]. Although Hill testified that he saw the appellant "strike him [Oates] in the chest," he did not realize that Oates had been stabbed until Oates walked up to Robert Moseley's car [R. 95, 97]. Hill testified that they first took Oates "down by his mother's house," then to Bibb County Hospital. Hill stated that when they arrived "about three of us" told the attending nurse to call an ambulance. Hill stated he was not sure that anyone even informed the nurse of Oates' condition, or requested treatment for him at the Bibb County Hospital [R. 101, 102].
Henry Steven Levert testified that he was employed for the Bibb County Ambulance Service. Levert stated he received a call from the Bibb County Hospital, and arrived at the hospital about five minutes later [R. 108]. He stated that Oates' sister accompanied him on the trip to Druid City Hospital in Tuscaloosa which took about twenty-five minutes. Levert testified that Oates died before they arrived at Druid City Hospital near "the turn-off on McFarland Boulevard" in Tuscaloosa [R. 109].
Millie Oates, sister of deceased, testified that she did not see her brother until after he was stabbed when she was picked up by the group that took her brother to the hospital. The witness testified that she rode with her brother in the ambulance to Tuscaloosa. She stated that she did not recall anyone requesting treatment for her brother at Bibb County Hospital [R. 117].
Sheriff Jack Lee testified he conducted the investigation of the stabbing death of Taylor Oates, Jr. He stated that there were blood stains on the ground where the stabbing took place. Sheriff Lee stated he also examined the body of the deceased at Druid City Hospital in Tuscaloosa and interrogated several witnesses that were present there [R. 124].
Dr. Richard Roper of the Alabama Department of Toxicology and Criminal Investigation *Page 1334 
testified he conducted a post-mortem examination on the body of Taylor Oates, Jr., at Lee's Funeral Home in Marion, Alabama. He described the fatal wound as "a very clean cut wedge-shaped wound which measured seven-eights of an inch in length in the upper right chest, immediately below the collar bone" [R. 128]. Dr. Roper stated that in his opinion the wound was made with a knife, or a knife like object, and he determined that Taylor Oates, Jr.'s "death resulted from hemorrhage and shock, resulting from a stab wound to the chest in which the right subclavian artery was lacerated" [R. 132].
Appellant's first witness was Bessie Wallace, an L.P.N. at Bibb County Hospital. She testified that she was on duty the night Taylor Oates, Jr., was stabbed. She stated that a group of people came into the hospital that night and asked her if a doctor was on duty. The witness testified that she told them that no physician was on duty at the time, but Dr. Owning was on the way to the hospital to treat two patients previously admitted to the emergency room. Mrs. Wallace testified that someone requested her to call an ambulance, but she instructed them to go over to the nurses' station and ask someone there to call for them. Mrs. Wallace stated she never saw Oates, nor was she ever informed that he was outside the hospital, bleeding severely [R. 153]. Mrs. Wallace testified that after they left and went to the nurses' station to call an ambulance, she never saw them again [R. 156].
The appellant then called Van Harris, a friend of the appellant for about seven years, and a life-long friend of the deceased, Taylor Oates. Van Harris testified that on the day in question, he got off work and went over to Earnest "Snoop" James' house and drank "a couple of beers and a little under a half pint . . ." [R. 161]. Harris then testified that he went down to the school around six-thirty that evening and "ran into" the appellant. The witness stated that he and the appellant went back to "Snoop" James' house and bought a half pint of gin and two beers [R. 162]. Harris stated that they then went back over to the school where they met Taylor Oates, Jr. [R. 163]. Harris testified that Oates accused them both of stealing ten dollars from him. Harris said he and the appellant tried to explain to Oates that they had not taken his money and also stated that they offered Oates a drink of their liquor [R. 165]. Harris testified that Oates took the bottle and poured the gin out on the ground. Harris said that he, the appellant, and Oates then began arguing, both about the liquor and the missing ten dollars. Harris testified that at this point the appellant had neither hit nor threatened Taylor Oates [R. 165, 166]. Harris did, however, testify that when Oates turned and walked away from the argument, the appellant threw a beer can over Oates' shoulder. He stated that Oates turned around and "came back and we argued some more." Harris testified that during this argument, Oates slapped the appellant and "about this time Lewis hit him with the knife" [R. 166]. Harris said that immediately before the stabbing, Oates and the appellant were facing each other, and both had their right hands in their pockets [R. 167, 168, 173]. Harris testified that immediately after the appellant stabbed Oates, the appellant's brothers, who had just arrived, "pulled him [appellant] back," and that Oates turned around and walked away [R. 169].
Don James, brother of the appellant, testified that he had played football with the appellant the afternoon of the day in question, that he then went inside the community center and played a few games of pool [R. 181]. James testified that when he and another brother, Alfred, left the community center that evening, they noticed the argument among the appellant, Van Harris, and Taylor Oates. James stated he heard Oates call the appellant a "son of a bitch," and that his brother told Oates "he was telling the truth" [R. 182]. James testified that at the time Oates and the appellant were facing each other, they both had their right hands in their pockets. He stated "both hands moved at the same time," and that *Page 1335 
his brother "hit Taylor Oates" [R. 184]. James said that after his brother stabbed Oates, he, the appellant, and his other brother, Alfred, walked together to their mother's home.
The testimony of Alfred James was essentially the same as that of his brother, Don. He added that when they got to the spot where the argument was taking place, he heard Oates tell the appellant, "You think you're big because your brothers are here," and also heard Oates ask the appellant, "Why did you slap me?" Alfred James further testified that when Van Harris told them to "cut that bull shit out," Oates "kind of came out of his pocket, and Lewis came down" and stabbed Oates [R. 189]. Alfred James stated that he never saw Oates with a knife [R. 190].
The appellant's next witness was his mother, Lena Mae James. She testified the appellant came home crying after the incident and told her that he and Oates had "gotten into it"; that Oates had "thrown out the whiskey and then slapped him"; and that when Oates drew on him, he blocked his lick and come back in on him" [R. 194].
The appellant, Lewis James, testified that he was employed at Seamen Lumber Company, and had gotten off of work on the day in question around 3:30 in the afternoon. He stated that after work, he played football with his "two brothers and some other guys," then went home and changed his clothes. He then testified that he left his home and headed for the "school," and ran into Taylor Oates, Jr., along the way. The appellant testified that Oates asked him where he was going and if he wanted someone to walk with him. The appellant testified that he told Oates that "if he wanted to, come on," and then he and Oates "went out to the school" together. The appellant said that he and Oates shot a few games of pool, then he [appellant] left, met Van Harris, and they went down to "Snoop" James' house to buy some whiskey [R. 200]. When they came outside of the James' house, they "ran into" Jesse Davidson, who showed the appellant two knives. The appellant asked Davidson to let him have one because he was scared that "some guys were going to jump on me." The appellant stated he was referring to "some guys" who had shot at him back in 1969, and whom he had seen in town that night. The appellant testified that Davidson gave him a switchblade knife, then he and Van Harris headed for the school. The appellant stated that they met Oates at the school and asked him if he wanted some whiskey. The appellant testified Oates took the bottle and poured the whiskey out, and when he questioned Oates as to why he did that, Oates told him if he "didn't like it to do something about it," and then slapped him [R. 202]. The appellant testified that Oates and Harris began arguing and that he then "walked back up" and asked Oates why he had slapped him. The appellant stated that Oates told him again that "if you don't like it, do something about it" [R. 203]. Appellant testified he replied, "Naugh, but I don't like nobody slapping me in my face." He stated that Oates then walked off, and at that time he [appellant] threw a beer can "back on the other side of the road" [R. 204]. The appellant testified that Oates turned around and came back toward him and told the appellant, "If you've got a knife, you had better pull it." He stated that when he heard a "click," he pulled his knife, blocked Oates' blow, and "hit him" [R. 205]. He stated that after stabbing Oates, he left with his brothers and went to his mother's house where he stayed about fifteen minutes. The appellant stated he then went to his home and returned to his mother's house later that night. The appellant testified he threw his knife away on the return trip to his mother's house, and was arrested late that night by Sheriff Lee while at home in bed. The appellant further testified that on two previous occasions he had been threatened by the deceased. He stated that the first incident occurred "over in Brent in the projects" where Oates pulled a knife on him, and the second occasion was at "Snoop" James' house where, after asking *Page 1336 
Oates for some whiskey, Oates threatened to "kick my ass" only because "he didn't like me" [R. 222]. The appellant stated that on the night in question, he was afraid that Oates was going to stab him when Oates threatened him that he had "better know how to use a knife because he was going to use his" [R. 223].
In rebuttal, the State offered the testimony of Jesse "Rob" Davidson, Jr., who denied giving the appellant a "switchblade" the night of the stabbing. Davidson further denied even seeing Van Harris or the appellant that night at "Snoop" James' house, but did admit on cross-examination that he had seen Van Harris at "Snoop" James' house that evening [R. 242].
Mattie Lee Driver testified that Taylor Oates, Jr., had been at her house watching television the night he was killed. She stated that Van Harris and the appellant came by her house to get Oates to go with them to the school. The witness testified that only Harris came inside to talk with Oates, but she noticed the appellant standing outside and stated that subsequently "they all got up and left" together [R. 250, 253].
The appellant's sole rebuttal witness was Albert Bulls, III, a second year law student at the University of Alabama School of Law. Mr. Bulls testified that he had done some investigating for appellant's counsel in regard to this case. Mr. Bulls stated that he had talked with Jesse "Rob" Davidson, who told him that he had seen Van Harris and the appellant together the night of the stabbing and that he had given the appellant a knife on that occasion.
 I
Prior to trial, appellant's counsel moved to quash the jury venire alleging the systematic exclusion of women from the jury roll of Bibb County. At an evidentiary hearing held on said motion, the appellant's statistical data indicated that the jury roll was comprised of only 37.2% females, whereas the "true cross section" was about 52.1% females. The appellant also noted that the four jury venires called immediately prior to his trial had an average make-up of 24.1% females. In addition, the appellant offered the testimony of Mrs. Frances Hawkins, Clerk of the Bibb County Jury Commission. Mrs. Hawkins testified that the Bibb County Jury Commission was composed of three members: Mr. Milton Palmer, Mr. L.R. Robinson, and Mr. O.B. Weaver, who served as Chairman. Mrs. Hawkins stated that women were first introduced to the jury roll of Bibb County in January, 1967. Her testimony also revealed the procedure utilized to compile the jury roll and established that names [which comprise the jury roll of Bibb County] are obtained from various sources. Among these sources are telephone books, voting lists, tax assessor's records, and from personal interviews, some of these with people "in the waiting room" at the Department of Pensions and Securities [R. 18, 23]. Mrs. Hawkins testified that a general list of names is compiled and that the Commissioners then go out into the different beats and attempt to locate these people and ascertain "their ages and occupations, and so forth, before they are placed in the box" [R. 18]. She stated that such information is usually obtained by interviewing the "prominent" black and white citizens of different beats who, in addition, provide the Commissioners with new names of potentially qualified jurors. Mrs. Hawkins testified that after the Commissioners return with this information, those persons who were not located, and those found to be exempt or otherwise disqualified, are removed from the general list, and they then "gather up new names and put them back in their places" [R. 19, 20]. Mrs. Hawkins stated that when the list is completed, she types up the names on white index cards and places them in the jury box. Mrs. Hawkins stated the Bibb County Jury Commission meets every August to recompile the jury roll, as required by statute.[1] Newly qualified jurors are added, and those then disqualified or exempt by law are deleted so as to reflect a correct compilation of qualified jurors in the county. *Page 1337 
Mrs. Hawkins testified that as far as the Commission was concerned "everyone is a potential juror" [R. 21]. She stated that approximately "five hundred to two thousand" names are on this list, and that the only reason an otherwise qualified juror would not be on the list would be "if they were under the age of twenty-one and over the age of sixty-five, or they were employed in the occupations that would disqualify them as a juror . . ." [R. 20]. When specifically asked by the court, "Is there any systematic exclusion of women from the jury rolls in Bibb County, Alabama . . .?" Mrs. Hawkins replied, "No, sir, I am a female and I wouldn't want to exclude myself" [R. 37, 38]. However, Mrs. Hawkins could give no reason for the fewer number of females on the jury roll.
We note on the outset that the appellant has the initial burden of showing the existence of purposeful discrimination of women on the account of their sex from jury participation.Butler v. State, 285 Ala. 387, 232 So.2d 631 [1970]. As pointed out by Mr. Justice Almon, then a member of this Court, inJunior v. State, 47 Ala. App. 518, 257 So.2d 844, cert. denied,288 Ala. 744, 257 So.2d 852 [1971]:
 ". . . [P]urposeful discrimination must be proven and may not be assumed or merely asserted, and the quantum of proof necessary to establish such fact is a matter of federal law." [Authorities cited]
In United States v. Butera, 1 Cir., 420 F.2d 564 [I.C.A. 1975], we note the following:
 ". . . The Supreme Court has normally imposed on the defendant the initial burden of demonstrating, prima facie, the existence of purposeful discrimination. However, the exact meaning of `purposeful discrimination' has been elusive at best . . . Thus, while `purposeful discrimination' may connote an element of bad faith in ordinary usage, the term has not been so limited by the Supreme Court; rather, the breath with which the term has been used by the Court indicates that purposeful discrimination exists whenever significant unexplained disparities exist. In other words, it is not the significant disparities themselves which are unconstitutional, they only raise the inference of discrimination. Once that inference has been raised, it is the government's failure or inability to demonstrate that the disparities are not the product of discrimination which confirms the inference and invalidates the jury pool." [Citations omitted]
In dealing with this issue of systematic exclusion of blacks from jury participation, Justice Embry, writing for our Supreme Court in Beecher v. State, 294 Ala. 674, 320 So.2d 727 [1975], noted the following:
 ". . . Mere statistical disparity between the number of blacks presumed eligible for jury duty and the number actually included in the jury roll does not of itself establish a primary inference of invidious discrimination. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759
(1965). This is not to say that substantial disparity would not do so. Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). These cases illustrate that each case must be considered on its own peculiar facts. Alexander, supra, does indicate that where there is opportunity for discrimination then this, coupled with statistical disparity, may be enough to establish the rebuttable inference of impermissible exclusion."
However, there appears to be some doubt as to whether the "allocation of burdens established for cases of racial discrimination in jury selection applies to cases of jury discrimination on the basis of sex." McGhee v. King,518 F.2d 791 [5 Cir. 1975].
In any event, we do not feel that the appellant has here met the first of his "twofold burden" in establishing a prima facie case. A reading of several federal cases involving the issue of systematic exclusion of women indicates that a greater percentage of disparity than appears here in the *Page 1338 
instant case must be shown in order to raise an inference of discrimination. United States v. DiTommaso, 405 F.2d 385 [4th Cir. 1968] [Prima facie case not met by evidence that women, though constituting 52.1% of eligible population had average representation of 29%]; United States v. Butera, supra [52% true cross section — 36% actual representation in jury pool]; see also United States v. Bryant, 291 F. Supp. 542 [D.Me. 1968].Butera, supra, indicates that at least a thirty percent underrepresentation of women must be shown in order to raise a rebuttable inference of discrimination.
Therefore, in view of this and in absence of any evidence of intentional exclusion, we cannot say that the underrepresentation reflected in these figures is so substantial as to warrant a reversal of the trial court's determination on this issue. Moreover, there has been no showing that the jury roll "spectacularly was not a cross section of the community." Jackson v. Morrow, 404 F.2d 903 [5th Cir. 1968], or that prospective jurors were selected on the basis of anything other than their individual qualifications.
As stated in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824,13 L.Ed.2d 759 [1965]:
 "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group."
The trial judge, therefore, correctly denied the appellant's motion to quash the jury venire.
 II
The appellant next contends that certain remarks made by the trial judge in the presence of the jury were unduly prejudicial and require a reversal of his conviction. The remarks in question were made during the trial judge's explanation to appellant's counsel as to his reasons for sustaining the State's objection to the appellant's testimony concerning prior threats made by the deceased, Taylor Oates, Jr., to the appellant. The alleged prejudicial remarks were not only the basis for the appellant's motion for a mistrial, but also served as the stated grounds in his motion for new trial.
The record reflects the remarks complained of as follows:
 "Q Now, let me ask you this: Had you ever been threatened by Taylor Oates before.
"A Yes, sir.
"Q When.
"A I got threatened two times —
 "MR. MORROW: (Interposing) I am going to object. Your Honor, unless they relate it to something.
 "MR. KNOWLES: That is admissible, Your Honor — self defense, and show of prior threats to show who is the aggressor and the apprehension that he had.
 "THE COURT: Yes, but you are showing by the defendant and Taylor Oates is not here to deny it —
"MR. KNOWLES: (Interposing) I am sorry —
 "THE COURT: (Interposing) The `Dead Man's Statute' applies to criminal cases just the same as civil cases.
 "MR. KNOWLES: He is not saying what he said, but telling what he did.
 "THE COURT: Well, I think you need to bring that in by some other people. This defendant — he could get up here and say, `Yeah, he said so-and-so and he said he was going to kill me next time he saw me' — and he couldn't be here to say, `No.'
 "MR. KNOWLES: They were the only ones that were there at the time and he's the only one that can testify to it, and I think it is important for this jury to know.
 "THE COURT: Unless you bring it in by some other party besides the defendant, I am not going to let the defendant testify to it.
 "Q Had Taylor Oates, Junior ever pulled a knife on you before?
"A Yes, sir.
"Q When was that?
 "A Out there on the basketball court about a month before that. *Page 1339 
"MR. MORROW: I object to that.
 "THE COURT: Yes, I think you have got to bring it in by another witness. Now, if you can get some other witness to come in here and say he threatened him and pulled a knife on him, I will rule it in, but I am not going to let this defendant testify to that, because he can testify to anything.
 "MR. WHITE: Judge, I would ask you to instruct the jury not to consider that.
 "MR. KNOWLES: He is testifying like all the other witnesses are testifying, Your Honor.
 "THE COURT: I am going to apply the `Dead Man's Statute' in this case and I am going to see if this applies in this kind of case.
 "MR. KNOWLES: All right, Your Honor, I am not going — I am not arguing with Your Honor, but are you saying that we cannot, at this time, show evidence — testimony given by Lewis James, the defendant, of prior threats and actual drawings of knives upon him by the deceased?
 "MR. MORROW: I am going to object to him saying this before this jury — if it is admissible, it is admissible and I object to him saying that and I ask that the jury be instructed not to consider that.
 "THE COURT: Now, I think that any threats — and I so instruct the jury — that any threats, or anything that Taylor Oates did to this defendant prior to this particular time — any other witness could testify to it and bring it in and put it before this jury, and I will give you an opportunity to get it, if you can get it — if it was on a football field, you ought to be able to get it, and I'm not going to let this defendant stand up here and testify to a whole lot of threats and things that took place between the deceased person who is now dead. If it took place right then, all right, but —
"MR. KNOWLES: (Interposing) Judge, I think —
 "THE COURT: (Interposing) Prior threats are all right. You can bring them in, but I don't think the defendant can bring them in just on his own volition.
 "MR. KNOWLES: Judge, could we go outside the presence of the jury, and could I make a showing as to what we expect to show by this testimony?
"THE COURT: All right, we will do that.
 "(Whereupon, the attorneys for the State and the attorney for the defendant and the court have an off the record discussion and showing of prior threats, said discussion and showing take place outside the presence of the jury. . . .)"
After the off-the-record discussion, the trial court correctly ruled that the appellant could testify in regard to the prior threats made by the deceased to him in support of his claim of self-defense. See McCaghren v. State, 52 Ala. App. 509,294 So.2d 756, rev'd on other grounds, 292 Ala. 378,294 So.2d 766 (1974); Hunter v. State, 295 Ala. 180, 325 So.2d 921
(1975). The trial court then adjourned for the day, and immediately after the court reconvened the following morning, the record reflects the following transpired:
 "(The following motion came on to be heard outside the presence of the jury in the presence of the attorneys for the State and the attorney for the defendant and the court; following which the following occurred:)
 "THE COURT: All right, Mr. Knowles, you may proceed with your motion.
 "MR. KNOWLES: I wonder if I could get the court reporter to read back what was said yesterday afternoon? On the way home last night, I started thinking about what was said in the courtroom in front of the jury concerning the question of law and the fact of whether or not Lewis James could testify to prior threats. Butch, I wonder if you could read back from the time the State objected to that testimony until we stopped?
"THE COURT REPORTER: Yes, sir.
 "(Whereupon, said testimony was read; following which the following occurred:)
 "MR. KNOWLES: I would like to get in the record that as I was going home yesterday, my memory told me that there *Page 1340 
were statements that were made by Your Honor which would — in front of the jury — which would tend to indicate to the jury that you had doubts as to the propriety of the defendant testifying to events that happened to him and the deceased, and, furthermore, indicating that that would allow this defendant to testify things that weren't true and not have the deceased there to testify as to the contrary, if there was a contrary side, and I think that will taint the testimony of this defendant concerning prior threats on him by Taylor Oates, and, also, taint his all testimony and prejudice the case so severely that I am not sure that the jury could fairly consider his testimony at this point and, on that basis, I know of no way to charge that out at this time and, on that basis, I would like to ask for a mistrial.
 "THE COURT: Your mistrial is denied. I will charge the jury not to consider any statements that were made by me with reference to his testifying to former threats by the deceased and that his testimony is to be considered by the jury just the same as any other witness.
 "MR. KNOWLES: Can we check about those taped statements?
 "MR. MORROW: Yes, they are here if you want to listen to them.
 "(Whereupon, said tapes of Van Harris and Robert Moseley were played for the benefit of the attorney for the defendant; following which the following occurred:)
 "MR. KNOWLES: The judge wants to get in the record he did allow me to hear the tapes of Van Harris and Robert Moseley.
 "(Whereupon, the attorneys for the State and the defendant and the court return to the courtroom into the presence of the jury; following which the following occurred:)
 "THE COURT: Members of the jury, when we stopped yesterday, there was a question —
 "MR. MORROW: (Interposing) Judge, we have got some witnesses still in the courtroom.
 "THE COURT: Are there any witnesses in here — if there are any witnesses in here, you must get out of the courtroom. Anybody that expects to testify in this case will have to go back here (indicating).
"(Witnesses leave courtroom.)
 "THE COURT: Members of the jury, yesterday when we stopped the trial, we had a question to this witness about threats that had been made against him by the deceased. The District Attorney objected to it and the court might have made some remarks about his doubt as to whether he could testify to threats — former threats that were made to him by the deceased. We have studied the law and we have come to the conclusion that he can testify to that and any remarks that were made that might tend to influence any question about this defendant's testimony, I am going to ask you to disregard that and take that out of your mind. This defendant has got a right to take the stand and testify in his own behalf and has got a right for his own testimony to be considered just the same as any other witness's and if there is anything that was said that might have put any question in your mind about it, put it aside — forget it, and listen to this witness's testimony just the same as you do any other witness."
Furthermore, it appears that the trial judge attempted to remedy the evil effects of his remarks in his oral charge to the jury:
 "Now, each time I state the contentions of the defendant, or the contentions of the State, I again am not saying whether they are true or false. I state them to you to show you the issues. You are the triers of the fact. I am strictly neutral in this case; I have no feeling either way, and if you have gotten the conclusion from something I have said, either to the lawyers, or to the witnesses, that might give you an idea about how I feel in this case, get it out of your minds, because I am neutral in this case. If I had a feeling *Page 1341 
in this case, I would step down and let somebody else try it."
The appellant contends that the Judge's remarks, not only were invasive of the jury's important and exclusive right of weighing the evidence, but also impressed upon them the belief that his testimony was incredulous. Moreover, the appellant contends that, despite the judge's attempt to eradicate the prejudicial effect of his remarks, their impact upon the jury was of such a degree that it was impossible for them to fairly weigh his testimony with open minds.
In Jarmon v. State, Ala.Cr.App., 333 So.2d 897 (1976), we observed the following:
 ". . . [A] trial judge must be ever aware that he wields great influence upon a jury and that his slightest word or intimation may injuriously effect the substantial rights of the defendant. In view of this unquestionable influence, any declaration of the court prejudicing the defendant in the minds of the jury is error which would of necessity effect a reversal."
A case involving a claim of improper remarks by a trial judge detracting from the weight of the evidence being offered rest on its own peculiar facts. Lockett v. State, 50 Ala. App. 58,276 So.2d 643 (1973).
In the instant case, the judge's comments on the propriety of the appellant to testify about previous threats of the deceased were made at the time the appellant was on the stand testifying in his own behalf. The appellant was seeking to prove that his actions were justified because of his belief that at the time he stabbed Taylor Oates he was subject to death or grievous bodily harm himself. The appellant's success in establishing his claim of self-defense hinged on the weight that was to be given to his testimony by the jury.
Although the judge's remarks were made in support of his ruling and were impelled by a natural sense of explanatory argument, they were nevertheless tantamount to a direct comment on the credibility of the appellant. The fact that the remarks were made at the time the appellant was attempting to give merit to his self-defense claim gave a special sting to them. Moreover, even though the able trial judge did all that could possibly be done to undo or neutralize the harm caused by his statements, we feel that under the circumstances of the case the probable impression made on the jury could not have been eradicated by any explanation. The inescapable and natural inference which the jury could draw from the judge's remarks is clear — namely, that the appellant's testimony concerning prior threats is suspect "because he can testify to anything . . . he could get up here and say, `Yeah, he said so-and-so, and he said he was going to kill me next time he saw me' — and he [Taylor Oates] couldn't be here to say, `No.'"
As stated by our Supreme Court in Moulton v. State, 199 Ala. 411,74 So. 454 (1917):
 ". . . [I]t is matter of common knowledge that jurors are very susceptible to the influence of the presiding judge, watching him with a quick understanding of every indication of opinion. . . ."
Therefore, after a careful consideration of the case as presented upon the whole record, we feel that the comments in question were of such character that the enormous prejudice generated by them could neither be explained away nor charged out. Watts v. Espy, 211 Ala. 502, 101 So. 106.
Such remarks bring this case within the purview of that line of cases which deem such comment ineradicable and therefore prejudicial error. Watts, supra; Stain v. State, 273 Ala. 262,138 So.2d 703; Bozeman v. State, 25 Ala. App. 281, 145 So. 165;Renfroe v. State, 49 Ala. App. 713, 275 So.2d 692.
For the errors shown, the judgment is therefore reversed and remanded.
REVERSED AND REMANDED.
CATES, P.J., and DeCARLO and BOOKOUT, JJ., concur.
HARRIS, J., concurs in result.
[1] See Title 30, § 20, Code of Alabama 1940. *Page 1342