This is an appeal from a conviction for selling amphetamine, a controlled substance, in violation of the Alabama Uniform Controlled Substances Act of 1971. Code of Alabama, 1973 Cum. Supp., Tit. 22, § 258 (33). Defendant was sentenced to imprisonment for nine years.
Defendant was indicted on October 2 and arraigned on October 22, 1975, at which *Page 1262 
time he pleaded not guilty, and his case was set for trial on December 1, 1975. On December 3, 1975, defendant requested a continuance of the case, which was granted, and the case was set again for trial on April 5, 1976. On March 31, 1976, a motion was filed by defendant attacking the composition of the jury roll and jury box of Marshall County. There was a hearing on the motion on April 2, 1976, at which defendant and his attorney were joined by other defendants by their attorneys, who apparently had filed similar motions. The motion is referred to by counsel for appellant and counsel for appellee as a motion to quash the venire. Appellant urges that the denial of such motion constituted prejudicial error that should result in a reversal of the judgment.
In support of the motion defendant relied largely upon the testimony of the clerk of the Marshall County Jury Commission and one of the members of the Commission. In addition, defendant introduced the testimony of the clerk of the Circuit Court and the registrar of Marshall County and a deputy clerk of the Circuit Court.
Appellant vehemently criticizes the members of the Jury Commission and strongly argues that they failed miserably to measure up to their duties under the law. We should say that there are many indications in the evidence that they failed to comply with all their duties.
The original motion relative to the jury complained of the composition of the "venire." An amendment to the motion substituted the words "jury roll" for "venire." In accordance with such amendment defendant's motion was not addressed to the composition of the jury venire or jury panel that had been drawn and summoned for the week of his trial, from which a jury to try him was selected. We find no complaint made as to such venire.
The motion as amended contains five groups of complaints as to the composition of the Marshall County jury roll. It asserts that, at the time, the jury roll did not reflect a representative cross-section of persons in the county qualified for jury service in that it contained
 (a) a disproportionately larger number of men than women;
 (b) a disproportionately larger number of older persons than younger persons;
 (c) a disproportionately larger number of married persons than unmarried;
 (d) a disproportionately larger number of owners than non-owners of real estate;
 (e) a disproportionately larger number of householders than non-householders.
It is charged in the motion in effect that the complained of composition of the jury roll was caused by "a systematic and intentional exclusion" from the jury roll of persons within such disproportionately smaller groups on the roll.
There is evidence to the effect that the number of men on the jury roll was disproportionately larger than women, that the number of persons between nineteen and thirty years of age was disproportionately smaller than other age groups. A marked disparity is to be found between males and females; seventy-three percent of the persons on the roll were males and twenty-seven percent females as opposed to the Marshall County 1970 census of 26,284 male and 27,927 female. A striking disparity is also to be noted in some of the age groups, particularly persons between nineteen and twenty-five years of age.
As to the disparity between the old and the young and between male and female, this Court has recently spoken through now Presiding Judge Tyson in Giddens v. State, 333 So.2d 615
(Ala.Cr.App. 1976) and James v. State, 337 So.2d 1332
(Ala.Cr.App. 1976).
Included in the contention that young people were disfavored in the composition of the jury roll is reference to the failure to include but an extremely small number of persons 19 and 20 years of age. The time for the annual meeting of the Jury Commission for making the jury roll is between August 1 and December 20 of the year. Code of Alabama, Recomp. 1958, Tit. 30, *Page 1263 
§ 20. The law relieving persons 19 years of age or over of the disabilities of non-age became effective July 2, 1975. Act No. 77, Regular Session 1975. In Giddens, it was stated:
 "Appellant contends that his motion to quash the venire should have been granted in view of the State's admission that the jury lists did not include 19 and 20 year olds.
 "We note that at the time of appellant's trial in October of 1975, Act No. 77, Regular Session 1975, had been in effect less than three months. Furthermore, the Attorney General's opinion which was introduced by appellant at the hearing on his motion to quash and which construed Act No. 77 as in fact lowering the minimum age for jury service in this state to 19 was dated August 28, 1975. Moreover, while there is testimony in the record which might indicate otherwise, Charles Edward Lawler, a member of the Lee County Jury Commission, testified that the Commission had begun compiling a list of 19 and 20 year olds but that it would "take 6 months, probably" to complete the job.
 "Viewed in this light, we do not feel error was here shown. Many courts have of necessity recognized an allowable administrative lag time between the effective dates of laws lowering the minimum age for jury service and the additions of the newly eligible jurors to the jury lists. United States v. Osborne, 8 Cir., 482 F.2d 1354; United States v. Olson, 8 Cir., 473 F.2d 686; United States v. Nakaladski, 5 Cir., 481 F.2d 289; United States v. Kuhn, 5 Cir., 441 F.2d 179. See also United States v. Gooding, 5 Cir., 473 F.2d 425 where the lag time was three years, four months.
 "Though not necessary to a resolution of this appeal, we would only point out a majority of those courts confronted with the issue, have held that `young persons' per se do not constitute an identifiable group for purposes of determining whether or no a particular jury system reflects the requisite cross-section of the community. United States v. Briggs, D.C., 366 F. Supp. 1356 (21-29 years of age); Connell v. State, 56 Ala. App. 43, 318 So.2d 782 (18-25 years of age); Williamson v. State, 52 Ala. App. 617, 296 So.2d 241 (under the age of 35). See also Hurley v. State, Court of Criminal Appeals, 335 So.2d 183, and cases cited therein. See also Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590."
In James, relative to the jury roll or box in Bibb County composed of 37.2 percent females, whereas the actual percentage of females in Bibb County was 52.1 percent, it was held that there was no basis for quashing the jury venire. The court said at 1337:
 "We note on the outset that the appellant has the initial burden of showing the existence of purposeful discrimination of women on the account of their sex from jury participation. Butler v. State, 285 Ala. 387, 232 So.2d 631 [1970]. As pointed out by Mr. Justice Almon, then a member of this Court, in Junior v. State, 47 Ala. App. 518, 257 So.2d 844, cert. denied, 288 Ala. 744, 257 So.2d 852 [1971]:
 "`. . . [P]urposeful discrimination must be proven and may not be assumed or merely asserted, and the quantum of proof necessary to establish such fact is a matter of federal law.' [Authorities cited]"
". . . .
 "In any event, we do not feel that the appellant has here met the first of his `two-fold burden' in establishing a prima facie case. A reading of several federal cases involving the issue of systematic exclusion of women indicates that a greater percentage of disparity than appears here in the instant case must be shown in order to raise an inference of discrimination. United States v. DiTommaso, 405 F.2d 385 [4th Cir. 1968] [Prima facie case not met by evidence that women, though constituting 52.1% of eligible population had average representation of 29%]; United States v. Butera, supra [1 Cir., 420 F.2d 564] [52% true cross section — 36% actual representation in jury pool]; see also United States v. Bryant, 291 F. Supp. 542 [D.Me. 1968]. Butera, *Page 1264 
supra, indicates that at least a thirty percent underrepresentation of women must be shown in order to raise a rebuttable inference of discrimination."
Giddens and James supra, answer adversely the major contention of defendant as to the jury roll, that is, that it was weighted against females and against youth, unless we can say that there was purposeful, invidious discrimination against them. In some portions of the evidence there may be found gleanings to that effect, but the testimony taken as a whole shows the contrary. Although the efforts did not succeed in raising the quota of the proportionately smaller groups to an extent aspired to by some, the evidence is to the effect that special efforts were made to increase the quotas of them. Special attention was given to the desirability of placing more names of young people in the box or on the roll. The Commission consisted of only two members, during part of the time. There is evidence that one of them employed an outsider to do most of the work required of such commissioner, which we do not condone. Nevertheless, there is no substantial evidence that a commissioner, a clerk or anyone working for the Commission was in any way opposed to a proportionate representation of all groups and classes.
It should be readily observable that a jury roll or jury box, without any intentional exclusion of or invidious discrimination against women and young people, may have a consistency disproportionate to their actual proportion in the community. As to the male-female dichotomy, the sources of information available to jury commissioners are more likely to reveal data with reference to men than to women. For varied reasons the names of married women are not usually contained in telephone directories. Women are not as free as men in moving around unaccompanied by one of the other gender. They stay at home and out of the main stream more than men. Furthermore, in considering the qualifications of jurors, jury commissioners have the right, and should, consider the practical availability for jury service of prospective jurors. Although women have responded to the call for jury service with commendable cooperation, the fact is it is at a much greater sacrifice than for men. They are needed not only during conventional working hours, a forty-hour week or less, but men cannot take their place for many of the needs at home. Old but still true is the saying:
"Man may work from sun to sun,
"But woman's work is never done."
As to a sub-proportionate representation by youth, special problems are presented to jury commissioners in performing their duty to place in the jury box or on the jury roll persons who are "generally reputed to be honest and intelligent" as legally required. Code of Alabama, Recompiled 1958, Tit. 30, § 21. The character of a young person, often good, is not generally known to as many as that of an older person. His character may be much better, but the better a person is known the more established his reputation becomes. In determining the reputation of another, one does not go around indiscriminately asking the question; but in talking with third persons, sometimes over long periods of time, he learns from them whether another is "generally reputed to be honest and intelligent."
There was little, if any, substantial evidence that there was any discrimination against persons because they were not freeholders or householders or because they were not married. We think the Jury Commission had the right to take into consideration the fact that, if a person could not read English, he is disqualified unless he "is a freeholder or householder." Code of Alabama, Recompiled 1958, supra.
The trial judge, who heard all the witnesses on the subject testify, justifiably came to the conclusion that there was no purposeful discrimination against persons qualified to act as jurors in Marshall County, and there was no error in overruling defendant's motion to quash the venire.
We do not hold that the jury roll at the time of the hearing on the motion to quash, *Page 1265 
substantially conformed to the requirements of Code of Alabama, Recompiled 1958, 1973 Cum.Pocket Part, Tit. 30, § 20, or that there had been as of that time substantial compliance with all the duties by the members of the Jury Commission and its clerk. Such a question is better resolved, and, if resolved against the Commission, a more beneficent result is obtained, by a mandamus proceeding against the members of the Commission, in which they are given a right to answer and be heard, after due notice and an adequate opportunity to present their side of the case, as was true in Gregg v. Maples, 286 Ala. 274,239 So.2d 198 (1970).
Appellant urges that the trial judge should have recused himself. In his brief appellant states that beginning "on page 88 of the record the trial court took over the examination of the circuit clerk and began questioning her as to the procedure that she followed in regard to juror cards, etc." Appellant refers to an interrogation of the witness after she had testified on re-direct examination by counsel for defendant and counsel had completed such re-direct examination by stating, "Judge, that's all I have." Immediately thereafter the following occurred:
 "THE COURT: Mrs. Albert, you're notified that the jury is to be drawn, is that correct?
"WITNESS: Yes, sir.
 "THE COURT: What is the first thing you do when the Judge starts drawing the jury? What do you do with the envelope?
"WITNESS: I date it.
 "THE COURT: And are cards drawn for a specific term of court at that time?
"WITNESS: Yes, sir.
"THE COURT: What do you do with those cards?
 "WITNESS: I stamp the back of each card with the date of the trial week.
"THE COURT: What do you do with them next?
 "WITNESS: I turn them over to you if it's not time for us to have them and you seal the envelope and give them to my office at the time we're entitled to get them.
"THE COURT: Each card then is dated?
"WITNESS: That's right.
"THE COURT: And the envelope is dated?
"WITNESS: Yes, sir.
 "THE COURT: And who do you give this envelope to right after they're drawn?
"WITNESS: To the Judge.
"THE COURT: And when do you next see it?
 "WITNESS: At the time . . . I can't remember how many days it is that we get them from . . .
 "THE COURT: But you get them back, is that correct, from the Judge?
 "WITNESS: At the time the list is due to go out. In time to prepare the list to go out so many days ahead.
 "THE COURT: And then you get the cards . . . then you get the envelope back, is that correct?
"WITNESS: That's right.
 "THE COURT: Do you seal the envelope when you give it to the Judge?
"WITNESS: Yes, sir.
 "THE COURT: And when the envelope comes back to you, have you ever known one not to be sealed at that time?
"WITNESS: No, sir.
 "THE COURT: And what is done in the clerk's office at that time?
"WITNESS: We unseal them . .
 "MR. CARNES: Your Honor, we think we're going to enter our exception to the court taking over the case. If the court has undertaken to assume an adversary position to our petition, then it should recuse itself.
 "THE COURT: Overruled as to that, Mr. Carnes. I'm just trying to get the facts out as to what happens to the jury while it's in her hands.
". . . ." *Page 1266 
Counsel continued to press the challenge of the propriety of the trial court's interrogating the witness and on the basis that the trial judge was assuming the role of an advocate and thereafter added to that ground that the evidence, and statements of the trial judge, indicated that he had some knowledge of some of the facts as to which the witness was interrogated.
We are convinced that nothing in the interrogation of the witness by the trial judge justified any implication that it had "undertaken to assume an adversary position." It is the duty, as well as the right, of a trial judge to propound questions to witnesses if necessary to obtain proper evidence bearing on issues. Jones v. State, 292 Ala. 126, 290 So.2d 165
(1974); Whetstone v. Caudle, 54 Ala. App. 299, 307 So.2d 697
(1975); Flurry v. State, 52 Ala. App. 64, 289 So.2d 632, writ denied, 292 Ala. 720, 289 So.2d 644. It has been held that this is especially true where the issue is one to be determined by the judge and not a jury. Dorminy v. Dorminy, 51 Ala. App. 70,282 So.2d 686 (1973); Baggett v. Baggett, 47 Ala. App. 539,258 So.2d 735 (1972).
Appellant argues under a caption "Trial Judge's Bias and Interest" that information, as revealed by the judge, which he had obtained in his official capacity as one of two circuit judges in the process of drawing cards of jurors from the jury box to form venires to be summoned for jury duty, together with comments made by the trial judge relative to the issues and the evidence, required his recusal as requested by defendant's counsel. In this respect appellant refers particularly to Code of Alabama, Recompiled 1958, Tit. 30, § 40, requiring the names of all jurors drawn and summoned who are not empanelled to be returned by the judge to the jury box in open court, unless they are disqualified or exempt. It is argued that the judge had an interest in the case.
The interest that disqualifies a judge is a personal interest, not the interest that he has in dedicating himself to the task of doing his utmost to see that justice according to law is accomplished. No charge against the judge was included in the motion with reference to the jury roll. No contention was made at that time that the trial judge or the other regular judge of the circuit, was disqualified to handle the case. The witness who testified as to the drawing and empanelling of jurors was called by defendant to testify as to the process. Defendant is chargeable with knowledge that the judge had a part in that procedure. The more appropriate time to challenge the qualification of the judge was when defendant first had knowledge of the judge's connection with a part of the process of obtaining jurors to try a case.
In Ex parte White, 53 Ala. App. 377, 300 So.2d 420, 430, cert. denied 293 Ala. 778, 300 So.2d 439, it is stated:
 "The bias or prejudice which will disqualify must be `personal' as distinguished from `judicial' bias. `Personal', as contrasted with `judicial', characterizes an attitude of extra-judicial origin, derived non coram judice. Craven v. United States, 1 Cir., 22 F.2d 605."
The Alabama Canons Of Judicial Ethics, Canon 3, provides standards in pertinent part as follows:
"C. Disqualification:
 "(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
 "(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;"
The registrar, who testified on the call of defendant, brought with her the official records of the office of registrar showing the registered voters in Marshall County. Defendant offered such records in evidence. There was considerable colloquy among the court and counsel relative to the ponderous nature of such records, during which the court stated:
 "THE COURT: The court's not going to allow all the voter . . . we're not going to take all the voter registration *Page 1267 
records away from the Registrar, and you may . . . if you have some figures compiled as to how many of them are thirty, if somebody's inspected the records, and how many of them are thirty and how many of them are twenty-nine and so forth, you may furnish that information, but we are not going to accept all those voluminous records into evidence."
Thereafter the court allowed defendant at the request of counsel "to take one page at random out of one of these registered books and make a copy of it and put it in the record as illustration of the type of information that's on it and what we're . . and as an illustration of what we're trying to show to the court." It developed, however, that this did not satisfy defendant. Finally the court concluded the discussion by informing all concerned that no one would "deny that there is a disproportionate number of persons summoned for jury duty of people under thirty." . . . "and the court is aware of what you're talking about and the court accepts it as a fact that there's not as many of those people as compared to their number in the general population which is the evidence you're talking about that you wanted introduced." The court further stated that the voter registration records do not show "what percentage of people that age have voted, or registered to vote."
We find no error prejudicial to defendant in the action of the trial court with reference to the records of the registrar. It is clear that such records would have added nothing of value on the issues involved in the motion before the court.
During re-cross examination of a witness for the state, Detective Tommy Cole, employed by the City of Albertville, who had testified with other witnesses as to the sale of the amphetamine tablets, he was asked whether he had previously talked to defendant about an investigation as to a Mr. Gilbert about an entirely different kind of matter. After several questions had been asked and answered, the following occurred:
 "Q All right. So you were trying to talk to Mr. Kittle about an investigation against Mr. Gilbert, is that correct?
"A That's correct.
 "Q Now was there also some other potential defendant involved in your investigation of Mr. Gilbert, someone else you were trying to . . .
"MR. STARNES: Judge, I'm going to object.
"THE COURT: I'll sustain.
 "MR. BEARD: Your Honor, I want to show the interest of the City of Albertville, the officials of the City of Albertville, their interest in making this false case.
"THE COURT: I'll sustain at this point, Mr. Beard.
 "MR. BEARD: All right. Your Honor, will I have the same right as the District Attorney to tie it in later at sometime?
 "THE COURT: Mr. Beard, please proceed with your case.
"Mr. Beard (Continued):
 "Q Were you also investigating Mr. Joe Campbell, who is a councilman here in the City of Albertville? Mr. Gilbert and Mr. Campbell, were you investigating those two?
"MR. STARNES: Judge, I object.
"THE COURT: I'll sustain.
"Mr. Beard (Continued):
 "Q Did you discuss with the Mayor or the Mayor discuss with you his interest in securing an arrest or conviction of these two individuals, particularly Mr. Campbell?
"MR. STARNES: Judge, I'm going to object.
"THE COURT: I'll sustain.
"Mr. Beard (Continued):
 "Q Mr. Cole, prior to the arrest of Mr. Kittle on September the 14th, had you tried to get him to sign a statement accusing two other residents here in the City of Albertville of some illegal act?
 "MR. STARNES: Judge, I object to the form of the question. It's not material; it's irrelevant.
"THE COURT: I'll sustain. *Page 1268 
"Mr. Beard (Continued):
 "Q All right. Prior to the arrest of Mr. Kittle on September the 14th, had you approached him, Mr. Cole, in your official capacity as a detective for the City of Albertville and ask that he give you certain information about his employer or his friends, Mr. Gilbert and Mr. Campbell, and he refused?
"MR. STARNES: Judge, again . .
"Mr. Beard (Continued):
"Q Did that occur?
"THE COURT: I'll let him answer that question.
"A No, sir, not that he refused to, no, sir.
"Mr. Beard (Continued):
 "Q He co-operated with you in this investigation fully?
 "A To the best of his knowledge, according to what he told me.
"Q To the best of his knowledge?
"A According to what he told me. That's what he said.
"Q Did he sign a statement or anything for you?
"A No, sir.
"Q He was real helpful to you in your investigation?
"A Well, he just didn't know much.
"Q What?
"A He didn't know anything, he said.
 "Q Well, now, after he said he didn't know anything much about his employer and about a City Councilman here, the next time you saw him, you arrested him, didn't you, on September the 14th?
"A No, sir. I couldn't testify to that.
"Q What?
"A I couldn't testify to that.
 "Q Well, he did not disclose information to you and then you had him arrested through this complicated scheme that you've testified about here today, didn't you?
"MR. STARNES: Judge, I'm going to object to that.
"THE COURT: I'll sustain as to that."
In insisting that the court committed error that in sustaining the State's objections contained in the above-quoted excerpts from the record, appellant argues testimony sought to be obtained from Detective Cole would tend to show bias and that such evidence was admissible under cross-examination in accordance with the principle splendidly stated by Mr. Justice Bloodworth in Wells v. State, 292 Ala. 256, 292 So.2d 471. Counsel for defendant made known to the court that he wanted "to show the interest of the City of Albertville, the officials of the City of Albertville, their interest in making this false case." To what extent, if any, that would show bias of the witness against defendant was certainly unclear at that time. The same is true as to any interest of the mayor in securing an arrest or conviction of the two individuals named. The objections to the first of the three questions quoted were properly sustained. Thereafter, when counsel made it clearer to the court what he was attempting to show as to any feelings between the witness and defendant relative to the named individuals, the court overruled the State's objections to questions along that line, until the last question quoted above, which was argumentative and, but for the reference to a "complicated scheme", called for no evidence in addition to that previously admitted. The court was not in error in sustaining the State's objections to the questions.
It is also to be noted that the testimony of Detective Cole, as well as testimony of other witnesses for the State, was undisputed and so substantively convincing that its credibility could not have conceivably been impaired in material respects by evidence tending to show bias. The jury passed only upon the question of the defendant's guilt or innocence. The punishment was properly fixed by the court. There could have been no prejudice to defendant in the court's action in limiting cross-examination of Detective Cole as shown above.
The pills or tablets that the undisputed evidence shows were sold by defendant *Page 1269 
were taken by Detective Lang, on September 16, two days after defendant was arrested for the sale of them, to the State Department of Toxicology at Huntsville. He had placed them in an "evidence envelope" and had sealed the envelope; he delivered the envelope to Mrs. Kim Gibson, a crime lab analyst, of the Department and obtained her receipt therefor. On September 22, Mr. Allen Adair, an experienced criminalist of the Department, whose qualifications were admitted by defendant's counsel, received from Mrs. Gibson a sealed envelope with "A.G. Lang, 9/16/75" signed across the seal. Within the envelope was "one Albertville Police Department evidence bag" having the name "Braxton Kittle" written on the label, in which were twenty-one oblong white tablets. He made an analysis of some of the tablets and found that they contained amphetamine. Objections were made to his testimony as to his analysis and determination on the ground that there was not sufficient evidence to show that the particular tablets were those sold by defendant. Appellant takes the position that there was a missing link as to custody in that the evidence did not show that the tablets analyzed by Mr. Adair, which had been delivered to him by Mrs. Gibson, were the same tablets that were delivered by Detective Lang to Mrs. Gibson. As anything is possible, it is conceivable, of course, that someone unlawfully trespassed in the files and records of the Department of Toxicology and Criminal Investigation and made a switch of the tablets, but establishment of a chain of possession or custody does not require proof that every conceivable, though extraordinarily unlikely, breaking of the chain has not occurred. The evidence shows that meticulous care was taken by Detective Lang in securing the evidence against tampering and similar care was taken by Mr. Adair in observing the identifying marks and the secured condition of the container. In Easley v. State, 56 Ala. App. 102, 319 So.2d 721 (1975), Mr. Adair testified as to his analysis of drugs he received from Dr. Van Pruitt of the Office of Toxicology in Huntsville. The court, speaking through Judge Harris, held:
 "The state's evidence as to the custody and possession of the narcotics in this case unequivocally shows there was no missing link in the chain of identification. Identification and continuity of possession were sufficiently established, affording ample assurance of the authenticity of the pills or tablets and the analyses conducted by the Toxicologist. Powell v. State, 47 Ala. App. 582, 258 So.2d 923; Green v. State, 42 Ala. App. 439, 167 So.2d 694; Aaron v. State, 271 Ala. 70, 122 So.2d 360; Dennison v. State, 259 Ala. 424, 66 So.2d 552; Oury v. State, 53 Ala. App. 240, 298 So.2d 661."
We so hold in this case.
Except as it may be found in appellant's claim as to a missing link, there is no contention that the verdict is not amply supported by the evidence, and we are convinced that no such contention can be sustained.
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
AFFIRMED.
All Judges concur.